Joseph A. MAUN, as trustee, 1962 trust for Alys Wunderlich Bachler, Town of Woodside, et al., Appellants,

v.

UNITED STATES of America, Appellee.

William J. ADAMS and Janet K. Adams et al., Appellants,

v.

UNITED STATES of America, Appellee.

Nos. 19373, 19374.

United States Court of Appeals Ninth Circuit.

May 20, 1965.

Rehearing Denied Aug. 24, 1965.

Wilson, Harzfeld, Jones & Morton, San Mateo, Cal., for appellant Town of Woodside.

Austin Clapp, Redwood City, Cal., Paul N. McCloskey, Jr., McCloskey, Wilson & Mosher, Palo Alto, Cal., for appellants Town of Woodside, Joseph A. Maun, Howell C. Jones, Edith M. Jones, Charles Savage, Ethel M. Savage, William J. Adams and Janet K. Adams.

J. Edward Williams, Acting Asst. Atty. Gen., Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., Cecil F. Poole, U. S. Atty., Charles R. Renda, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before HAMLEY and MERRILL, Circuit Judges, and MATHES, District Judge.

HAMLEY, Circuit Judge:

This is an interlocutory appeal from an order entered in consolidated condemnation proceedings brought by the United States to acquire electric transmission line easements in Woodside, California and adjacent unincorporated areas in San Mateo County. The appellants are the Town of Woodside, County of San Mateo, and certain of the affected landowners, all of whom are defendants in the condemnation proceedings.

On May 13, 1960, Congress authorized an Atomic Energy Commission (AEC) research project known as the Stanford Linear Accelerator Center (SLAC). 74 Stat. 120. The sum of $114,000,000 was subsequently authorized for the construction of this plant. Act of September 26, 1961. 75 Stat. 676. This AEC project is intended and designed for basic research in high energy physics and not as a plant for the production of electrical energy by nuclear means.

One of the essential requisites of the project is the availability of a sufficient quantity of conventionally generated electricity to operate the complex equipment. AEC plans to obtain a part of this supply from the United States Bureau of Reclamation, delivery to be made over lines to be constructed by Pacific Gas and Electric Company (P. G. & E.). The balance of the required electric

energy is to be generated by P. G. & E. and transmitted to SLAC over the same lines.

In January, 1963, AEC and P. G. & E. entered into a contract designed to effectuate this plan. The contract provides that P. G. & E. would obtain such permits as were necessary, and that the contract would be filed subject to the approval of the California Public Utilities Commission.

In fulfillment of its obligations under this contract, P. G. & E., in June, 1963, applied to the planning commissions of Woodside and the county for the necessary use permits. In these applications the company proposed a tie line from its main Monte Vista-Jefferson transmission line to SLAC. This tie line would consist of two three-cable 220,000 volt circuits suspended from standard towers to be located on a one-hundred foot strip of land cleared of trees and vegetation. The proposed route runs first through unincorporated county territory, then through Woodside, and again through unincorporated territory to its terminus.

At least as early as 1950, San Mateo County had a zoning ordinance which required a public utility to secure a conditional use permit from its planning commission and board of supervisors if it sought to construct power transmission lines. Upon its incorporation in 1956, Woodside continued the county pattern of regulation. In 1958, the town adopted a zoning ordinance prescribing the same regulatory procedure.

Upon filing its application, P. G. & E. was met with demands from the county and town that the line be placed underground as a condition to the issuance of the necessary use permits. P. G. & E. and AEC took the position that an underground transmission line would not be as serviceable or desirable from a service point of view and that it would entail a substantial additional cost over and above the estimated cost of an overhead line. Several conferences were then had but no agreement was reached.

On March 7, 1964, the chairman of AEC notified the County of San Mateo and Woodside that, although AEC was willing to attempt to find a mutually agreeable solution, time was of the essence since SLAC was nearing completion. The chairman advised the county and town that if P. G. & E. was unable to obtain the necessary use permits, AEC would be forced, in the national interest, to intervene directly by instituting eminent domain proceedings and to construct its own line.

In spite of this warning, Woodside and the county subsequently denied use permits to build an overhead transmission line, as applied for by P. G. & E. Contemporaneously with this action, Woodside adopted an ordinance prohibiting construction of an overhead electrical transmission line of fifty thousand volts or greater capacity. Woodside followed this with a general ordinance prohibiting the overhead installation of transmission, distribution or communication lines. The County of San Mateo did not enact ordinances of this kind.

On March 24, 1964, at the request of AEC, the United States Attorney filed on behalf of the United States in the district court a complaint in condemnation. In essence, the Government sought to condemn a one hundred foot wide perpetual and assignable easement over approximately 4.92 acres of land located within the boundaries of Woodside. The county, town and several individual property owners were named defendants.

This complaint was followed by a declaration of taking on April 30, 1964. Also on April 30, 1964, the United States filed a second complaint in condemnation against the State of California, County of San Mateo and several individual property owners. In this proceeding the Government sought to acquire a similar easement consisting of approximately 24.57 acres located within the county but outside the boundaries of Woodside. On the same day a declaration of taking was entered in this second condemnation suit.

Being aware that certain objections would be interposed, counsel for the Government, concurrently with the filing of the declarations of taking, requested

of the court that the Government be granted modified orders of possession limited to permission to conduct field surveys and design inspections. The district court granted this request and also granted the Government's further request that all objections and motions filed in both cases be consolidated and heard at one time.

The various defendants filed answers, motions to dismiss and, in the first proceeding, a motion for summary judgment. The Government thereupon filed a motion to strike defendants' motions to dismiss and for summary judgment, and all of the objections and alleged defenses raised in the answers.

Resisting the Government's motion, defendants contended at the hearing in the district court that section 271 of the Atomic Energy Act of 1954 (Act), 68 Stat. 960, 42 U.S.C. § 2018 (1958), deprived the Government of authority to condemn the tracts in question for the purposes and uses intended. Section 271 reads:

"Nothing in this chapter shall be construed to affect the authority or regulations of any Federal, State, or local agency with respect to the generation, sale, or transmission of electric power."

Following this hearing the district court, on June 12, 1964, entered an order granting the Government's motion. The court struck defendants' motions to dismiss, and motion for summary judgment, on the ground that Rule 71A(e), Federal Rules of Civil Procedure, precludes any pleading or motion by a defendant in a condemnation proceeding other than an answer. It struck all objections and alleged defenses in defendants' answers on the ground that:

"* * * Congress did not intend 42 U.S.C. 2018 [Section 271 of the Act], upon which defendants ground their defenses, to prevent the A.E.C. from condemning the easement in

question. Under the circumstances of this case, the Court has further concluded that plaintiff has not violated any rights of defendants by such taking."

■ On June 16, 1964, an order was entered by the district court giving the Government complete possession of the easement concerned, to the extent of the estate condemned. The district court thereafter amended its order of June 12, 1964, to include a recitation of the kind required under 28 U.S.C. § 1292(b) (1958), in order to enable defendants to apply to this court for leave to take an interlocutory appeal. Such an application was filed in this court and was granted.[1]

■ We do not understand that appellants challenge the action of the district court in striking their motions to dismiss and the motion for summary judgment. In any event the court did not err in so doing. Under Rule 71A(e), Federal Rules of Civil Procedure, the only response which a defendant may make to a complaint in condemnation filed in a district court is an answer. Atlantic Seaboard Corp. v. Van Sterkenburg, 4 Cir., 318 F.2d 455, 458; notes of Advisory Committee on Rules, following Rule 71A, 28 U.S.C.A., page 389. It need only be added that appellants are not prejudiced by the striking of these motions because the same objections and alleged defenses sought to be raised thereby were also raised in the answers.

The action of the district court in dismissing the answers amounted to a determination that the facts therein pleaded do not constitute a defense to the condemnation suit insofar as the Government's right to acquire the easements is concerned.

The essential facts pleaded in these answers are that: (1) the purpose of the United States in acquiring the easements is so that AEC may construct and operate an overhead transmission line for

---

1. In the absence of leave to appeal under 28 U.S.C. § 1292(b), the appeal could not have been entertained because it is not taken from a final order. See Catlin v. United States, 324 U.S. 229, 230, 233, 65 S.Ct. 631, 89 L.Ed. 911.

the purpose of receiving conventionally-generated electricity from P. G. & E. for use in operating SLAC; and (2) the town of Woodside and the County of San Mateo have declined to issue use permits required under their respective zoning ordinances for the construction and operation of such line, and the same would also be in disregard of ordinances of the Town of Woodside prohibiting such overhead lines.

Appellants argue that these allegations state a defense insofar as the Government's right to acquire the easements is concerned, because they bring into play a statutory limitation upon the function of AEC which, in this context, establishes lack of statutory authority to make the acquisition. The principal statutory limitation relied upon is section 271 of the Act, quoted above. Appellants also rely upon section 274(k) of the Act, 42 U.S.C. § 2021(k) (1958), added by the amendatory Act of September 23, 1959, 73 Stat. 688, 691. Section 274(k) reads:

> "Nothing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards."

The Government calls attention to the fact that an argument could be advanced to the effect that, even if AEC is precluded under sections 271 and 274(k) from constructing and operating a transmission line in disregard of the ordinances and regulations of Woodside and the county, this would not be a defense to an action in eminent domain. But the Government advises that it expressly foregoes this argument because it is most anxious to obtain a final judicial determination on the merits as to its power to construct and operate such an overhead line. In a further effort to direct our attention to the merits, the Government indicates its willingness to make, *arguendo*, the assumptions set out in the margin.[2]

We therefore turn to a consideration of whether AEC may construct and operate an overhead electric transmission line in disregard of local authority and regulations governing the character and location of such lines. It is our understanding that, in the special posture of the case as the parties submit it to us, if we hold that AEC may not do so, then it is agreed that the Government is without statutory power to condemn the easements, and the order is to be reversed. If we hold otherwise, affirmance is indicated.

■■ The general sovereign immunity of the federal Government, its agencies and instrumentalities, from state or local control of its governmental functions, is established under the Supremacy Clause of Article VI of the Constitution. Mayo v. United States, 319 U.S. 441, 63 S.Ct. 1137, 87 L.Ed. 1504, 147 A.L.R. 761.[3] It follows that the activities of AEC in connection with the construction and operation of the transmission line in question, are wholly immune from local control, unless it can be established that Congress has directed that AEC subject itself thereto.

The Act provides that the federal Government, through AEC, is to exercise exclusive control over the development

---

2. "(1) The AEC will proceed to construct this transmission line without applying for a use permit from either the County of San Mateo or the Town of Woodside. [Footnote omitted]

"(2) That AEC will construct an overhead transmission line on the easement condemned; and

"(3) That the actions of the Town of Woodside in effecting a temporary ordinance immediately prior to this condemnation prohibiting overhead transmission lines and that of the County of San Mateo in revoking a use permit pre-

viously approved for this line, were in good faith and not solely for the purpose of attempting to come within the purview of Section 2018." [Footnote omitted]

3. In view of the special issues which the parties have asked us to adjudicate, we do not take into account the federal Government's sovereign power of eminent domain, as enunciated in such cases as Kohl v. United States, 91 U.S. 367, 371, 23 L.Ed. 449; and United States v. Carmack, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209.

and use of atomic energy and special nuclear material for all purposes. Sections 1–3 of the Act, 42 U.S.C. §§ 2011–2013. To effectuate this purpose, Congress conferred upon AEC authority to, among other things, license the use of nuclear energy for industrial or commercial purposes (sections 101–103 of the Act, 42 U.S.C. §§ 2131–2133) and further, Congress not only authorized AEC to promote and conduct research in the nuclear field, but directed that AEC do so. Sections 31–33 of the Act, 42 U.S.C. §§ 2051–2053.

For the purpose of enabling AEC to fulfill these duties and perform these functions, the Act gives that agency specific authority to acquire such material, property, equipment, and facilities, establish or construct such buildings and facilities, and modify such buildings and facilities, as it may deem necessary. AEC is also expressly authorized to acquire, purchase, lease, and hold real and personal property, as agent to and on behalf of the United States. Section 161 of the Act, as amended, 42 U.S.C. § 2201 (e) and (g).[4]

Without doubt the sovereign immunity derived from the Supremacy Clause, coupled with these statutory provisions, authorize AEC to construct and operate an overhead transmission line in disregard of local authority or regulation, absent some statutory provision limiting AEC's authority in this regard. It is equally clear that neither the Act, nor any other federal statute called to our attention, contains an express limitation of this kind.

The question remains whether sections 271 or 274(k) of the Act, relied upon by appellants, constitute, by necessary implication, such a limitation.

Section 271 requires AEC to accede to the authority or regulations of any federal, state or local agency with respect to the " * * * generation, sale, or transmission of electric power." The line which AEC proposes to construct

and operate in Woodside and adjacent San Mateo County, is for the transmission of electric power. The zoning and other ordinances of Woodside and the county, here in question, pertain to the transmission of electric power, for if they are complied with AEC may not transmit such power through an overhead line. Looking at the face of the statute, then, it would appear that section 271, by necessary implication, precludes AEC from constructing and operating this overhead line.

But the Government argues that, read in the light of its legislative history, section 271 is seen to relate only to the generation, sale, or transmission of electric energy produced by nuclear means. Our attention is called to comments made by Senator Bourke B. Hickenlooper, Senate sponsor of the Atomic Energy Act of 1954, made during Senate consideration of section 271. Among other things, Senator Hickenlooper told the Senate, in explanation of section 271:

"We take the position that electricity is electricity. Once it is produced it should be subject to the proper regulatory body, whether it be the Federal Power Commission in the case of interstate transmission, or State regulatory bodies if such exist, or municipal regulatory bodies. We feel that there is no difference and that it should be treated as all other electricity which is regulated by the public. * * *

"That [section 271] is designed to keep the regulatory authority exactly as it is now, traditionally and under the law." (100 Cong.Rec. 11567, July 26, 1954, Leg.History of Atomic Energy Act of 1954, page 3760)

"What section 271 does is to make clear that this act does not interfere in any way with the jurisdiction of the Federal Power Commission over such activities, or with State agencies where they have jurisdic-

---

4. For the reason stated in note 3, we do not take into account the provisions of the Act, and of other statutes authorizing condemnation proceedings.

tion, or with local agencies where they have jurisdiction.

"It is not an authority given in a negative way. It is a positive negation of any intent by this statute to interfere with existing laws and the existing authorities, State and Federal, that have to do with electricity." (100 Cong.Rec. 11709, July 27, 1954, Leg.History of Atomic Energy Act of 1954, page 3834)

[5] We think these, and like remarks made by the sponsor of the 1954 legislation during the Senate debate, fairly indicate that the prime purpose of Congress in adding section 271 to the Act, was to make it clear that the generation, sale or transmission of electric power produced by nuclear means was to be subject to federal, state and local authority and regulation to the same extent that electric power produced by conventional means is subject to such authority and regulation.

We are not convinced, however, that Congress meant to confine the limitation imposed by section 271 to the generation, sale or transmission of electric power produced by nuclear means. Had this been the intent it would have been easy to express it by including, in section 271, a specific reference to nuclear production of electric power. Absent such a reference we are left with Senator Hickenlooper's perceptive observation that "electricity is electricity." It might be added that transmission is transmission, whether the electric power is going to or coming from an AEC installation.

■ It also seems to us that there is less reason to place emphasis upon legislative history in a case such as this where the statute to be construed is not ambiguous, than where the words of the statute give rise to a legitimate doubt as to the meaning intended. Moreover, as the Government concedes, the legislative history of section 271 is relatively sparse, apparently consisting principally of Senator Hickenlooper's statement along the lines referred to above.

There is no indication from anything that has been presented to us on this appeal, that if AEC is required to conform to local authority and regulations governing the character and operation of electric transmission lines, any overall objective of the Act will be defeated or impaired. According to a statement which Congressman Craig Hosmer, a member of the Joint Committee on Atomic Energy, made in Congress following a hearing which the committee held on this Woodside matter in January, 1964, the only real AEC objection to constructing an underground transmission line is because of the substantially greater cost.

Congressman Hosmer indicated that AEC was willing to consider an underground line of 180 megawatts, which would satisfy the minimum needs of the project for the first few years of its operation. AEC, he stated, was also willing to contribute to the estimated extra cost of such a line ($2,640,000 as compared to a cost of from $668,000 to $992,000 for the overhead line), but only if others would also bear a substantial part of the additional cost. Since such a compromise was not acceptable to the officials of Woodside and San Mateo County, AEC insisted upon proceeding with the plan for an overhead line. This cost consideration is apparently what the AEC chairman had in mind when he warned Woodside and the county that AEC may be forced to condemn "in the national interest."

Considering the magnitude of the SLAC project as a whole, and the fact that no engineering or other practical difficulty seems to be involved, the two million dollars or so (possibly five million) of additional money which would have to be expended to go underground can hardly be regarded as constituting a substantial impediment to this AEC research program. On the other hand, if sights are raised above the specific objectives of the Atomic Energy Act itself, to encompass national policy generally, there is good reason for believing that Congress meant what it said when it enacted section 271.

The described route lies in a scenic mountainside area characterized by steep gradients, a thin crust of soil, heavy rainfall, acute erosion problems, fire hazards and stands of redwood trees more than one hundred years old. Congressman Hosmer told Congress that the area surrounding the campus of Stanford University, where the overhead line would be built, " * * * is one of the loveliest areas of California and perhaps the Nation." He added, "One finds many beautiful homes placed on 3-acre minimum lots."[5] As before stated, utilization of the easements contemplates not only erection of power transmission lines but the denuding of the one hundred foot wide easement of trees and vegetation.

5. Congressman Hosmer's remarks are to be found in the Congressional Record—House, issue of May 7, 1964, pages 9,974 through 9,976. It should be added that he was not opposed to the construction of an overhead AEC line. His opinion in this regard appears to be predicated on the following factors: (1) in his view, and apparently that of some others, the idea that overhead lines would "debauch" or "desecrate" the landscape was not substantiated; (2) there are already numerous wooden power poles in the area, many of which have been erected in the last six years; (3) in his view there is no conservation issue; (4) under the AEC plan there will be only five additional "poles" (transmission towers?) through the Town of Woodside; (5) no one other than AEC is willing to contribute to the additional cost of going underground; and (6) if the Government were to pay the added expense of going underground it would create an undesirable precedent.

6. Title VII of the Federal Housing Act of 1961 contains sections which are now found in Title 42, § 1500 et seq., U.S.C. From section 1500(b):
   "It is the purpose of this chapter * * * to help provide necessary recreational, conservation, and scenic areas by assisting State and local governments in taking prompt action to preserve open-space land which is essential to the proper long-range development and welfare of the Nation's urban areas, in accordance with plans for the allocation of such land for open-space purposes." (Public Law 87–70)

In their effort to preserve the natural integrity of this area, Woodside and the county are pursuing the same goals as those sought under established federal policy, as manifested in other acts of Congress.[6] What both the federal Government and these local units of government are striving for in this direction is in the highest tradition of forward-looking government and fully compatible with, if not compelled by, the general public interest. As the Supreme Court said, in Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27, in speaking of the legitimate purposes of federal condemnation:

"The concept of the public welfare is broad and inclusive * * * The

With respect to highways and the recently approved Interstate Defense System (23 U.S.C. § 131 et seq.) Congress provided not only for the safety and convenience of public travel, but for its enjoyment, declaring:
"It is declared to be in the public interest to encourage and assist the States to control the use of and to improve areas adjacent to the Interstate System. * * * It is declared to be a national policy that the erection and maintenance of outdoor advertising signs, * * * should be regulated, * * *
"The Secretary of Commerce is authorized to enter into agreements with State highway departments * * * Any such agreement * * * may include, among other things, provisions for preservation of natural beauty, prevention of erosion, landscaping, reforestation, development of view points for scenic attractions that are accessible to the public without charge, * * * (Section 131)
"Such construction likewise may include the purchase of such adjacent strips of land of limited width and primary importance for the preservation of the natural beauty through which highways are constructed, * * *. Not to exceed 3 per centum of such sums, apportioned to a State in any fiscal year in accordance with section 104 of this title may be used by it for the purchase of such adjacent strips of land without being matched by such State. (Section 319.)"

values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled."

The Government argues that the fact that Congress approved AEC's 1964-1965 appropriations after being advised by Congressman Hosmer that AEC proposed to condemn these easements for an overhead transmission line, constitutes ratification of AEC's interpretation of section 271 as not precluding such action.

■ There are circumstances under which deliberate Congressional action by way of appropriations or other enactments may constitute ratification of an agency's construction of a federal statute. See United States v. Kennedy, 9 Cir., 278 F.2d 121, 126. Ordinarily, however, this can occur only when the agency interpretation is of long standing, and so well-established in administrative practice. This was certainly the situation in the Kennedy case, and also in Brooks v. Dewar, 313 U.S. 354, 361, 61 S.Ct. 979, 85 L.Ed. 1399, upon which Kennedy relied. We do not believe that an isolated instance of agency interpretation brought to the attention of Congress on one occasion in the course of considering a general appropriation bill, ought to be given that effect.

Had the construction of this transmission line been left with P. G. & E., that company would have been obliged to comply with the ordinances in question, notwithstanding the fact that the line is to serve AEC. The Government concedes this much. Had P. G. & E. built underground lines in conformity with the local authority and regulations, it could have recovered the cost thereof from AEC. The federal agency proposes to avoid this cost by constructing the line itself.

Since the easements being acquired are assignable, that agency will be able to turn the operation of the line over to P. G. & E. At the oral argument, counsel for the Government stated that it was hoped that such an arrangement could be made. In the process, and solely for that purpose, there will have been accomplished a complete disregard of local ordinances pertaining to the character and operation of electric power transmission lines.

■ We hold that section 271 precludes AEC from, in this manner, proceeding in defiance of the ordinances of Woodside and the county, ordinances not challenged as to validity and operative as to any other public utility operating in the area.

Reversed and remanded for further proceedings consistent with this opinion.