**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
               *Plaintiff-Appellee,*

      v.

14.02 ACRES OF LAND MORE OR
LESS IN FRESNO COUNTY; EDNA E.
STONE; PAUL KRAJIAN; SHRINERS
HOSPITAL FOR CRIPPLED CHILDREN;
DAVID C. WHITLOCK; EDWARD H.
MARSELLA; HENRY SCHAFER, JR.;
SHARON CECILE PECKINPAH; SHARON
CECILE MARCUS aka Sharon Cecile
Peckinpah; FERN L. PETER, LOLA
A. SWANSON; FLORENCE F. CLASS;
CLARENCE E. BERNHAUER, JR.; JANE
WHITLOCK STILES; NORMA B.
GIBBS; JUNE E. LUCAS; IRENE
MARLEY; HENRY SCHAFER, SR.;
DENVER C. PECKINPAH; SUSAN JANE
PECKINPAH; AGNES H. VIGNOLA;
DONG SHE MAR; BESSIE E.
BERNHAUER; LEONARD P. LEBLANC;
IVONE M. CARLSON; ELVIRA
MOSHER; LORRAINE S.
EICHENBERGER; ELEANOR C. HICKS;
TRUSTEE PETER FRECHOU; KATHRYN
MCAFEE; TRUSTEE JOHN C. RICKSEN
KATHRYN BROWN;

No. 05-17347

D.C. No.
CV-03-06019-REC/
LJO

ORDER
AMENDING
OPINION AND
DENYING THE
PETITION FOR
PANEL
REHEARING AND
PETITION FOR
REHEARING
EN BANC AND
AMENDED
OPINION

14889

ESTATE OF JOHNNY BELLO;
ESTATE OF LOUIS BELLO; FRANCIS
BELLO; EDWARD C. BEAUMONT;
PAULINE EICHENBERGER; LORRAINE
C. FORTNOY; FLOREEN L. WALSH;
TRUSTEE MARY FRECHOU ALLEN
MOORE; BEVERLY M. FIELDER; HAL
E. VERBLE; MAY EVYLEN
BERNHARD; GORDON WINANT
HEWES; PAULINE D. HANSON;
ELOISE MITCHELL; LAWRENCE E.
AUSTIN; EVELYN SANTOS; SAMUEL
B. BRECK DAVID BISWELL; STEPHEN
BISWELL; MELISSA BROOK
PECKINPAH; JOAN LEONARD; MAUDE
DAWSON; GERTRUDE PORTERFIELD;
WILLIAM J. MATHOS; JOHN ROBERT
SHORB; CANDACE HAAS; KRISTEN
LOUISE PECHINPAH; MATTHEW
DAVID PECHINPAH; J. DANIEL HARE,
III; BRADLEY B. LEONARD;
SECURITY TITLE INSURANCE; VICKI
TREASURER, FRESNO COUNTY; RUSS
FREEMAN; THOMAS C. HARE,
                    *Defendants,*

                    and

MAXINE H. SAWYER; MARK W.
SAWYER; HARRIET H. LEONARD;
CHARLES A. SAWYER; ANDREW
KLEMM; RAMON ECHEVESTE,
              *Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of California
Robert E. Coyle, District Judge, Presiding

Argued and Submitted
February 14, 2008—San Francisco, California

Filed June 24, 2008
Amended October 24, 2008

Before: William C. Canby, Jr. and Milan D. Smith, Jr.,
Circuit Judges, and Stephen G. Larson,* District Judge.

Opinion by Judge Canby

---

*The Honorable Stephen G. Larson, United States District Judge for the
Central District of California, sitting by designation.

**COUNSEL**

Bruce Leichty, Clovis, California, for the defendants-appellants.

Douglas R. Wright, United States Attorney, Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the plaintiff-appellee.

## ORDER

The opinion filed June 24, 2008, slip op. 7271, and appearing at 530 F.3d 883 (9th Cir. 2008), is amended as follows:

At slip op. at 7271, delete the full paragraph (beginning "In any event . . .") and its accompanying footnote 3, and substitute therefor the following two paragraphs:

In any event, the Supremacy Clause, Article VI, clause 2, of the United States Constitution forecloses Sawyer's noncompliance argument. Because WAPA is an agency of the federal government, its activities "in connection with the construction and operation of the transmission line in question, are wholly immune from local control, unless it can be established that Congress has directed that [WAPA] subjects itself thereto." *Maun v. United States*, 347 F.2d 970, 974 (9th Cir. 1965). We have accordingly required federal agencies seeking to condemn easements to construct power transmission lines to comply with state and local siting requirements where the Congress' authorization expressly required such compliance. *See id.* at 975 (requiring Atomic Energy Commission to comply with local ordinances in constructing overhead transmission line where the authorizing statute mandated that "[n]othing in [the relevant] chapter shall be construed to affect the authority or regulations of any Federal, State, or local agency with respect to the generation, sale, or transmission of electric power produced through the use of nuclear facilities licensed by the Commission"); *cf. Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 603 (9th Cir. 1981) (requiring the Bonneville Power Administration to comply with the substantive standards of Washington State's siting act—but not its procedural hurdles

—where an applicable statute expressly required "compliance with State standards").

In this case, however, Sawyer has not pointed to a comparable unequivocal pronouncement by Congress to overcome the presumption of preemption— and we could find none. None of the authorizing statutes discussed earlier in this opinion mandate compliance with state law. Indeed, the only statutory provision cited by Sawyer in support of its noncompliance argument is the Reclamation Act of 1902. 43 U.S.C. § 383. Although the Reclamation Act of 1902 does disclaim preemption of state law, it is irrelevant to this case, for it applies only to the "control, appropriation, use, or distribution of *water* used in *irrigation*, or any vested right acquired thereunder." *Id.* (emphases added). We therefore conclude that California law is preempted and WAPA is not required to comply therewith in constructing the congressionally-authorized Path 15 Upgrade.

With these amendments, the panel has voted to deny the appellants' petition for panel rehearing. Judge Smith has voted to deny appellants' petition for en banc rehearing, and Judges Canby and Larson have so recommended.

The full court has been advised of the above amendments and of appellants' petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Appellants' petition for panel rehearing and petition for rehearing en banc are denied. There are no other pending petitions for panel or en banc rehearing. No further petitions for panel or en banc rehearing will be entertained.

**OPINION**

CANBY, Circuit Judge:

Pursuant to a 2001 order of the Secretary of Energy, the Western Area Power Administration ("WAPA") selected certain land estates in the western portion of the San Joaquin Valley in California, where it planned to construct a high-voltage transmission line. The United States began condemnation proceedings in the district court on behalf of WAPA, seeking transmission easements on the lands selected by WAPA. Sawyer and a few other individual owners of condemned property (collectively "Sawyer") challenged the government's exercise of its power of eminent domain, claiming that the taking lacked proper congressional authorization, was not for a "public use" as required by the Takings Clause, and violated California law. The district court dismissed Sawyer's objections and, when the parties reached an agreement on the compensation amount, entered summary judgment *sua sponte*. Sawyer filed this appeal. We affirm.

**BACKGROUND**

In 2001, in an effort to mitigate California's electric power transmission constraints, the Secretary of Energy directed WAPA to prepare plans to construct the Los Banos-Gates Transmission Project, or Path 15 Upgrade. The project consists of an additional 84-mile, 500-kilovolt transmission line along Path 15, which is located in the western portion of the San Joaquin Valley and connects its northern terminus near Los Banos, California with its southern terminus at the Gates Substation near Coalinga, California. *See* Department of Energy, Los Banos-Gates Transmission Project: Record of Decision (hereinafter, "DOE Record of Decision"), 66 Fed. Reg. 65,699 (Dec. 20, 2001). The Secretary also instructed WAPA to explore partnership opportunities with private industry, *see id.*, and delegated authority to WAPA to acquire and condemn property interests in land to complete the proj-

ect. Department of Energy, Delegation Order No. 00-036.00 (Dec. 6, 2001), *available at* http://www.directives.doe.gov/ pdfs/sdoa/00-036_00.pdf (last visited May 28, 2008). WAPA updated plans that it had originally developed in the mid-1980s and accepted proposals from Trans-Elect and Pacific Gas and Electric Company to "finance, construct, and co-own the system additions." DOE Record of Decision, 66 Fed. Reg. at 65,699-700. The Federal Energy Regulatory Commission ("FERC") approved the proposed upgrade, which provided, among other things, that "WAPA w[ould] own the new 500 kV transmission line and associated land that is the most significant part of the transmission upgrades." Western Area Power Administration, FERC Order Accepting Letter Agreement, 99 FERC ¶ 61,306, at 62,278, 2002 WL 1308653 (2002), *aff'd, Pub. Util. Comm'n. of Cal. v. FERC*, 367 F.3d 925 (D.C. Cir. 2004).

In 2003, the United States began condemnation proceedings in the district court on behalf of WAPA to acquire easements on approximately 14.02 acres of land in western Fresno County, California. Sawyer filed an answer to the government's complaint and challenged the condemnation by asserting eight affirmative defenses. The government moved to strike the affirmative defenses or, in the alternative, for judgment on the pleadings as to its authorization to take. The district court granted the government's motion, concluding that "WAPA was fully authorized by federal law to construct the Path 15 Project and to condemn the power line transmission easement[s] for it." The district court also rejected Sawyer's argument that the upgrade did not serve a "public purpose."

One year later, the parties filed a Joint Pretrial Statement, in which they agreed that the "value of the property taken is $7,374.32." At a later evidentiary hearing, the government asserted that no viable issue remained for trial because the district court had previously granted judgment as to the lawfulness of the taking. Sawyer disagreed. The district court then requested supplemental briefing.

With the benefit of the parties' briefing, the district court concluded that no issue remained for trial and granted summary judgment *sua sponte* in favor of the government. The district court then entered final judgment and apportioned the stipulated value of the easements, $7,374.32, among the "approximately 73 ownership entities." Each entity was assigned compensation according to its percent ownership interest. (*Id.*) Ownership interests were computed on the basis of the title information supplied by the government. As of final judgment, neither Sawyer nor any other condemnation defendant had disputed such information.[1] (*Id.*) Sawyer filed this appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

### I.   Authorization and Lawfulness of the Taking

Where, as here, the parties do not dispute the amount of compensation, "[t]he only [substantive] question for judicial review in a condemnation proceeding is whether the purpose for which the property was taken is for a Congressionally authorized public use." *United States v. 0.95 Acres of Land*, 994 F.2d 696, 698 (9th Cir. 1993) (internal quotation marks and citation omitted). "Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch." *Berman v. Parker*, 348 U.S. 26, 36-37 (1954). In addressing Sawyer's challenges, we must assess both prongs of the "public purpose" inquiry set forth in our precedent. First, we must satisfy ourselves that the Secretary of Energy and the Administrator of WAPA enjoy statutory authorization to condemn property interests to construct the

---

[1]To the extent that other unnamed interest owners or their successors are not specifically mentioned in the district court's order, they remain entitled to claim their share of the award by presenting appropriate documentation to the district court. 28 U.S.C. § 2042.

Path 15 Upgrade. Second, we must decide whether the Path 15 Upgrade qualifies as a "public use" under the Takings Clause of the Fifth Amendment.

## A. Statutory Authority

There is no dispute that, if any federal agency is authorized to acquire land by eminent domain for the purpose of constructing the Path 15 Upgrade, that agency is WAPA. *See* 42 U.S.C. § 7152(a)(1)(D) ("There are transferred to, and vested in, the Secretary [of Energy] all functions [previously] of the Secretary of the Interior . . . with respect to . . . the power marketing functions of the Bureau of Reclamation, including the construction, operation, and maintenance of transmission lines and attendant facilities."); Department of Energy, Delegation Order No. 00-036.00 (Dec. 6, 2001), *available at* http://www.directives.doe.gov/pdfs/sdoa/00-036_00.pdf (last visited May 28, 2008). The operative question before us, then, is whether Congress ever authorized the construction of the Path 15 Upgrade at all.

[1] Numerous congressional enactments convince us that it did. In 1984, Congress enacted the Energy and Water Development Appropriations Act. The Act generally authorized

> the Secretary of Energy . . . to construct or participate in the construction of such additional facilities as he deems necessary to allow mutually beneficial power sales between the Pacific Northwest and California and to accept funds contributed by non-Federal entities for that purpose.

Pub. L. No. 98-360, tit. III, 98 Stat. 403, 416 (1984) (codified at 16 U.S.C. § 837g-1). This enactment clearly conferred discretion on the Secretary of Energy to construct power lines in the area where the Path 15 Upgrade is located. By citing this statutory provision in the Declaration of Taking, then, the Administrator of WAPA, as delegate of the Secretary, evi-

dently made the discretionary finding that the Path 15 Upgrade would facilitate the consolidation of the Pacific Northwest-California market.

[2] Since passage of this 1984 Act, Congress has repeatedly confirmed its authorization and appropriated funds to develop the Path 15 Upgrade. In the Supplemental Appropriations Act of 1985, Congress again authorized construction of transmission lines along the Pacific Northwest-California Intertie:

> Public Law 98-360 . . . authorized the Secretary of Energy to construct or participate in the construction of such project for the benefit of electric consumers of the Pacific Northwest and California. . . .

Pub. L. No. 99-88, tit. I, ch. IV, 99 Stat. 293, 321 (1985). In the same provision, Congress further indicated that "sufficient capacity shall be reserved, as recognized in [the] Memorandum, to serve the needs of the Department of Energy laboratories and wildlife refuges in California." *Id.* In turn, the Memorandum referenced by Congress committed WAPA to provide "a reasonable and proportionate share of the capital required for increasing the transfer capability between Los Banos and Gates," i.e., the Path 15 Upgrade. Department of Energy, Memorandum of Understanding for the California-Oregon Transmission Project, 50 Fed. Reg. 421 (Dec. 24, 1984). Thus, we have little doubt that, as early as the mid-1980s, Congress had authorized the Path 15 Upgrade.

Although construction of the Path 15 Upgrade did not progress beyond the planning stages in the 1980s and 1990s, in 2001, the House Appropriations Committee again proposed special funding to "complete the planning and environmental studies to support the proposed 84-mile, 500-kilovolt transmission line between Los Banos and Gates (also known as 'Path 15') in California." H.R. Rep. No. 107-102, at 24 (2001). The Conference Committee "provide[d] . . . [n]on-reimbursable funding of $1,328,000 . . . to complete planning

and environmental studies for the Path 15 transmission line," H.R. Rep. No. 107-148, at 61 (2001) (Conf. Rep.), *reprinted in* 2001 U.S.C.C.A.N. 259, 278, and Congress appropriated those funds through the Supplemental Appropriations Act of 2001, Pub. L. No. 107-20, 115 Stat. 155, 174 (2001).

**[3]** Finally, although no appropriation has specifically mentioned the Path 15 Upgrade since 2001, Congress has implicitly reaffirmed its authorization by funding WAPA through general appropriations "[f]or carrying out the functions authorized by title III, section 302(a)(1)(E) of the Act of August 4, 1977 (42 U.S.C. 7152)." Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, 117 Stat. 11, 152 (2003). These functions, in turn, encompass "the construction . . . of transmission lines and attendant facilities," which is the essence of the Path 15 Upgrade.[2] 42 U.S.C. § 7152(a)(1)(D). We therefore conclude that WAPA is authorized to carry out the Path 15 Upgrade by acquiring lands by eminent domain.

In reaching this conclusion, we reject Sawyer's argument

---

[2]Sawyer's discussion of the Flood Control Act of 1944 and its restriction on the construction of new transmission lines is unavailing. The Act applies only to "[e]lectric power and energy generated at reservoir projects under the control of the Department of the Army and in the opinion of the Secretary of the Army not required in the operation of such projects." Pub. L. No. 78-534, § 5, 58 Stat. 887, 890 (1944) (codified at 16 U.S.C. § 825s). Nothing suggests that the Path 15 Upgrade was ever under the control of the Department of the Army.

Similarly, it is true that the Reclamation Project Act of 1939 confers on the Secretary only limited authority to condemn land in connection with the construction of new transmission lines: "The Secretary is authorized, in connection with the construction or operation and maintenance of any project . . . to purchase or condemn suitable lands or interests in lands for relocation of . . . electric transmission lines . . . , the relocation of which in the judgment of the Secretary is necessitated by said construction or operation and maintenance." 43 U.S.C. § 389. But the "relocation" condition—to the extent it is judicially reviewable at all—does not curtail the Secretary's authorization to condemn land stemming from the other enactments to which we already have referred.

that, even if the Path 15 Upgrade has been authorized, WAPA is not at liberty to condemn property interests to realize the project. To the extent that Congress did not spell out the Secretary's and WAPA's eminent domain prerogatives in the enactments specifically authorizing the Path 15 Upgrade, we deem such omissions irrelevant. When Congress mandates the construction of a new high-voltage transmission line and appropriates funds to carry it out, it implies, by necessity if not common sense, the authority on the part of the executing agency to acquire land on which the transmission line may be constructed. *See, e.g.*, *City of Davenport v. Three-Fifths of an Acre of Land*, 252 F.2d 354, 356 (7th Cir. 1958) (rule of implied necessity authorizes eminent domain for the construction of duly authorized bridge, where condemnation is required to realize the project).

Finally, Sawyer generally contends that any authorization contained in these statutes is conditional on a preliminary finding that the Path 15 Upgrade is "necessary." Whereas a threshold finding of necessity is in fact required under the 1984 authorization, Congress has unequivocally committed that determination to the discretion of the Secretary (which has been delegated to WAPA). *See* 16 U.S.C. § 837g-1 (authorizing the Secretary of Energy "to construct or participate in the construction of such additional facilities *as he deems necessary* to allow mutually beneficial power sales between the Pacific Northwest and California and to accept funds contributed by non-Federal entities for that purpose.") (emphasis added). We are therefore not at liberty to review the agency's determination with respect to the necessity condition. *See United States v. 80.5 Acres of Land*, 448 F.2d 980, 983 (9th Cir. 1971) ("[T]he necessity of taking or appropriating private property for public use is legislative in nature and one over which the courts lack jurisdiction.").

## B.  The "Public Use" Requirement Under the Takings Clause

**[4]** We must next decide whether the Path 15 Upgrade satisfies the "public use" requirement of the Takings Clause

even though it is a partnership of public and private entities and the beneficiaries of the project arguably are the customers of privately-owned utilities, as opposed to the public at large. For over a century, the Supreme Court's "public use jurisprudence has wisely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power." *Kelo v. City of New London*, 545 U.S. 469, 483 (2005). It remains true, of course, that "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation." *Id.* at 477. At the same time, the Court has long abandoned any "use by the public" test for private-to-private transfers by eminent domain. *See id.* at 479-81 & nn.7, 9, 10 (collecting cases). " 'It is only the taking's purpose, and not its mechanics' . . . that matters in determining public use," *id.* at 482 (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 244 (1984)), and we do "not substitute [our] judgment for a legislature's judgment as to what constitutes a public use 'unless the use be palpably without reasonable foundation.' " *Midkiff*, 467 U.S. at 241 (quoting *United States v. Gettysburg Elec. Ry. Co.*, 160 U.S. 668, 680 (1896)).

**[5]** Applying these principles, we conclude that the Path 15 Upgrade satisfies the "public use" requirement. To begin with, the project hardly entails a private-to-private transfer at all. It is true that WAPA will initially receive only ten percent of the transmission system rights arising from the 500 kV capacity increase. Western Area Power Administration, FERC Order Accepting Letter Agreement, 99 FERC ¶ 61,306, at 62,278, 2002 WL 1308653 (June 12, 2002). However, "WAPA will own the new 500 kV transmission line and associated land that is the most significant part of the transmission upgrades." *Id.* Further, in its 1985 appropriations and mandate to the Secretary of Energy to expand the Pacific Northwest-California Intertie, Congress specified that "sufficient capacity shall be reserved . . . to serve the needs of the Department of Energy laboratories and wildlife refuges in California."

Pub. L. No. 99-88, tit. I, ch. IV, 99 Stat. 293, 321 (1985). In short, it is clear that Congress' purpose in authorizing the condemnation envisioned a continued proprietary and operational presence of the federal government.

Moreover, to the limited extent that the project does involve a transfer of property interests among private entities, such transfer poses no constitutional difficulty. In the pursuit of what it perceives as a "public use," "the Congress and its authorized agencies have made determinations that take into account a wide variety of values." *Berman*, 348 U.S. at 33. Therefore, "It is not for [the courts] to reappraise them." *Id.* In its 1984 authorization, Congress unambiguously expressed its intent to "allow mutually beneficial power sales between the Pacific Northwest and California." 16 U.S.C. § 837g-1. In so doing, it spoke to the value it intended to pursue—i.e., facilitating the consolidation of the western electricity market. It would therefore be impermissible for us to engage, as Sawyer asks us to do, in "empirical debates over the wisdom" of increased access to electricity or the effectiveness of the Path 15 Upgrade. *See Midkiff*, 467 U.S. at 242-43.

## C. Federal Preemption of the California Public Utility Commission Review

In a final substantive challenge, Sawyer contends that the condemnation is unlawful because WAPA did not obtain the approval of the California Public Utility Commission for the Path 15 Upgrade as required by California law. *See* Cal. Pub. Util. Code §§ 1001-06. We agree with the district court that Sawyer waived this argument by not advancing it in the Answer. Under Rule 71.1, "[a] defendant waives all objections and defenses not stated in its answer. No other pleading or motion asserting an additional objection or defense is allowed." Fed. R. Civ. P. 71.1(e)(3). Because Sawyer did not raise the federal government's failure to comply with California law in the Answer, we affirm the district court's waiver ruling.

In any event, the Supremacy Clause, Article VI, clause 2, of the United States Constitution forecloses Sawyer's non-compliance argument. Because WAPA is an agency of the federal government, its activities "in connection with the construction and operation of the transmission line in question, are wholly immune from local control, unless it can be established that Congress has directed that [WAPA] subjects itself thereto." *Maun v. United States*, 347 F.2d 970, 974 (9th Cir. 1965). We have accordingly required federal agencies seeking to condemn easements to construct power transmission lines to comply with state and local siting requirements where the Congress' authorization expressly required such compliance. *See id.* at 975 (requiring Atomic Energy Commission to comply with local ordinances in constructing overhead transmission line where the authorizing statute mandated that "[n]othing in [the relevant] chapter shall be construed to affect the authority or regulations of any Federal, State, or local agency with respect to the generation, sale, or transmission of electric power produced through the use of nuclear facilities licensed by the Commission"); *cf. Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 603 (9th Cir. 1981) (requiring the Bonneville Power Administration to comply with the substantive standards of Washington State's siting act—but not its procedural hurdles—where an applicable statute expressly required "compliance with State standards").

[6] In this case, however, Sawyer has not pointed to a comparable unequivocal pronouncement by Congress to overcome the presumption of preemption—and we could find none. None of the authorizing statutes discussed earlier in this opinion mandate compliance with state law. Indeed, the only statutory provision cited by Sawyer in support of its noncompliance argument is the Reclamation Act of 1902. 43 U.S.C. § 383. Although the Reclamation Act of 1902 does disclaim preemption of state law, it is irrelevant to this case, for it applies only to the "control, appropriation, use, or distribution of *water* used in *irrigation*, or any vested right

acquired thereunder." *Id.* (emphases added). We therefore conclude that California law is preempted and WAPA is not required to comply therewith in constructing the congressionally-authorized Path 15 Upgrade.

## II. Procedural Challenges

Sawyer also advances a number of procedural challenges that, he contends, require us to reverse the judgment of the district court and remand this case for further proceedings. We review each challenge in turn.

### A. Joinder of Owners of Fractional Property Interests

[7] The district court did not err in allowing the action to proceed without requiring the government to join all owners of fractional interests in the condemned property. Rule 71.1(c) provides:

> When the action commences, the plaintiff need join as defendants only those persons who have or claim an interest in the property and *whose names are then known*. But before any hearing on compensation, the plaintiff must add as defendants all those persons who have or claim an interest and whose names *have become known or can be found by a reasonably diligent search of the records*, considering both the property's character and value and the interests to be acquired. All others may be made defendants under the designation "Unknown Owners."

Fed. R. Civ. P. 71.1(c)(3) (emphases added). Here, WAPA and the Assistant U.S. Attorney investigated the title history and current interests in the condemned land, enrolled the services of an outside title investigator and, in the end, even attempted to cooperate with the defendants in an effort to

identify all interest owners. We conclude that the government has easily met the burden imposed by Rule 71.1(c).[3]

## B.   Service On Non-Objecting Defendants

[8] Sawyer contends that Rule 5 of the Federal Rules of Civil Procedure, required the government to serve its motion for judgment on the pleadings on those defendants who had neither objected to the condemnation nor filed a notice of appearance. But Rule 71.1 governs condemnation proceedings "except as this rule provides otherwise." Fed. R. Civ. P. 71.1(a). With regard to notice, Rule 71.1 provides that

> [a] defendant that has no objection or defense to the taking of its property may serve a notice of appearance designating the property in which it claims an interest. The defendant must then be given notice of all later proceedings affecting the defendant.

Fed. R. Civ. P. 71.1(e)(1). The only way to give effect to Rule 71.1(e)(1) is to interpret it as overriding the default requirement laid out in Rule 5, which mandates that "a pleading filed after the original complaint" be served on "every party." Fed. R. Civ. P. 5(a)(1)(B). Otherwise, the Rule 71.1(e)(1) option for non-objecting defendants to remain abreast of the case by filing a "notice of appearance" would be surplusage, for these defendants would be entitled to receive full service under Rule 5(a)(1)(B). Applying Rule 71.1(e)(1), therefore, the government was not required to serve non-objecting defendants

---

[3]To the extent that Sawyer relies on our 1952 decision in *United States v. Adamant Co.*, 197 F.2d 1, 4 (9th Cir. 1952) to establish a due process requirement to join "all persons having any interest in the property," his reliance is misplaced. *Adamant* was a post-condemnation case dealing with the apportionment of a compensation award among former interest holders, not a challenge to a condemnation. *Id.* at 3-5. Accordingly, the "universal joinder" principle it endorses is limited to "proceedings . . . to apportion the award[, in which] the condemnor has no interest." *Id.* at 5.

who did not file a notice of appearance with its motion for judgment on the pleadings.

### C.   Deference to Sawyer's Factual Allegations

**[9]** The district court did not err in refusing to defer to Sawyer's contentions pertaining to the "conditions and predicates" that confine WAPA's authority to take property. It is true that, in deciding a Rule 12 motion, the district court must "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). But the "conditions and predicates" to which Sawyer alludes are not "allegations of fact." *Id.* They are either nonreviewable discretionary determinations—as in the case of the "necessity" determination, *see supra* Section I.A—or pure questions of law—as in the case of the "public use" inquiry, *see supra* Section I.B. The district court properly declined to accord Sawyer's positions any deference.

### D.   Consideration of Documents Outside the Pleading

**[10]** The district court also did not abuse its discretion in taking judicial notice of the *Department of Energy National Transmission Grid Study* (May 2002) ("DOE Study"), which was not included in the pleadings, and referring to it as background material in its order granting the government's motion for judgment on the pleadings. *See Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 458 (9th Cir. 1995) ("An appellate court reviews the district court's decision to take judicial notice under Rule 201 for an abuse of discretion."). Although, as a general rule, a district court may not consider materials not originally included in the pleadings in deciding a Rule 12 motion, Fed. R. Civ. P. 12(d), it "may take judicial notice of matters of public record" and consider them without converting a Rule 12 motion into one for summary judgment. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (internal quotation marks and citation omitted). Judicial notice is

appropriate for records and "reports of administrative bodies." *Interstate Natural Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1954). The district court considered the DOE Study, which is clearly a "report[ ] of [an] administrative bod[y]." *Id.* Further, it referred to the report only as background material, without relying on it to resolve any factual dispute. We therefore conclude that the district court did not abuse its discretion in taking judicial notice of the DOE Study for the limited purpose for which the court considered it.

## E. The District Court's *Sua Sponte* Summary Judgment

**[11]** The district court did not err in granting summary judgment *sua sponte*. "*Sua sponte* grants of summary judgment are only appropriate if the losing party has 'reasonable notice that the sufficiency of his or her claim will be in issue.' " *Greene v. Solano County Jail*, 513 F.3d 982, 990 (9th Cir. 2008) (quoting *Buckingham v. United States*, 998 F.2d 735, 742 (9th Cir. 1993)). "Notice need not be explicit. . . . A party is 'fairly appraised' that the court will in fact be deciding a summary judgement [sic] motion if that party submits matters outside the pleadings to the judge and invites consideration of them." *In re Rothery*, 143 F.3d 546, 549 (9th Cir. 1998) (internal citations omitted). Sawyer met this condition by submitting two declarations outside the pleadings in support of his opposition to the government's motion, and he had a fair opportunity to contest the issues decided in the motion. *See id.* More fundamentally, with the exception of just compensation, Sawyer never raised any issue that required resolution of any question of fact. *See supra*. As a consequence, when Sawyer eventually entered into a stipulation with the government with respect to compensation, he effectively removed the only factual issue before the court. The district court did not err in granting summary judgment *sua sponte*.[4]

---

[4]We also reject Sawyer's contention that the court's ability to enter judgment on the pleadings was necessarily confined to Sawyer's *affirma-*

### F.  Apportionment of Just Compensation

**[12]** Finally, the district court did not abuse its discretion in apportioning the total compensation by accepting at face value the ownership information provided by the government. *See United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1269 (9th Cir. 2003) ("[T]he apportionment is left to either the discretion of the court, or the allocation agreed upon by the parties in a contract."). "The 'undivided fee rule' essentially operates by permitting the governmental authority to condemn property by providing just compensation, then allowing the respective interest holders to apportion the award among themselves, either by contract or judicial intervention." *Id.* In the absence of a contractual agreement among the property owners, it was proper for the district court to apportion the total amount of compensation by "judicial intervention." *Id.* Nor do we find an abuse of discretion in the district court's deference to the ownership information provided by the government where, as here: (1) no defendant objected to the court's apportionment or presented conflicting ownership data, and (2) the court has provided an opportunity for unknown fractional owners to obtain their share of the award at a later time.

## CONCLUSION

The district court did not err in granting summary judgment in favor of the United States or apportioning the compensa-

---

*tive defenses* and could not reach his *denial* of the allegations contained in the complaint. The government moved for—and the district court granted—"judgment on the pleadings *on the issue of the government's right to take* in this action." (emphasis added). Thus, the government's motion encompassed both affirmative defenses and the allegations in the Answer.

tion among the defendants. The judgment of the district court is

**AFFIRMED.**