Mary GONZALES, Plaintiff,

v.

MARRIOTT INTERNATIONAL, INC., Marriott Hotel Services, Inc., d/b/a Los Angeles Airport Marriott, Defendants.

CASE NO. CV 15–03301 MMM (PJWx)

United States District Court, C.D. California.

Filed November 4, 2015

Signed November 5, 2015

Hillary Benham–Baker, Julia Campins, Campins Benham–Baker LLP, Lafayette, CA, Meghan Boone, Institute for Public Representation, Georgetown University Law Center, Washington, DC, for Plaintiff.

Alexis A. Sohrakoff, Constance E. Norton, Littler Mendelson PC, San Francisco, CA, for Defendants.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

### MARGARET M. MORROW, UNITED STATES DISTRICT JUDGE

Mary Gonzales filed this action on May 1, 2015, against Marriott International, Inc., and Marriott Hotel Services, Inc., doing business as Los Angeles Airport Marriott (collectively "Marriott").[1] Gonzales received notice of her right to sue from the California Department of Fair Employment and Housing ("DFEH") and the Equal Employment Opportunity Commission ("EEOC") on January 30 and April 2, 2015, respectively,[2] after filing an administrative complaint with the DFEH on August 22, 2014, and an amended administrative complaint on August 21, 2014.[3] On June 19, 2015, Marriott filed a motion to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[4] On June 30, 2015, the case was transferred from the calendar of Magistrate Judge Charles F. Eick to this court.[5] Gonzales opposes the motion.[6]

## I. BACKGROUND

Gonzales is a full-time general accountant and cashier at the Los Angeles Airport Marriott ("LAX Marriott"), a hotel branch of Marriott International, Inc., that is operated by Marriott Hotel Services, Inc., in Los Angeles, California.[7] She works forty hours per week (from 9:00 a.m. to 5:30 p.m. Monday through Friday) at an hourly wage of $17.[8] She is allowed one unpaid thirty-minute lunch break and two paid ten-minute rest breaks per day.[9]

After entering into a gestational surrogacy agreement, Gonzales became pregnant in August 2013 and gave birth to a healthy female child on April 22, 2014.[10] Following the birth, Gonzales began to express milk several times a day for the child's family.[11] On June 9, 2014, during her approved maternity leave, Gonzales allegedly emailed her manager, Bill Dea, to inform him that she would need to express breast milk twice a day when she returned to work.[12] On June 13, 2014, when Gonzales returned to work, she expressed milk twice a day in her office for approximately ten days; each session lasted approximately twenty-five to thirty minutes.[13] Gonzales asserts that because her office was equipped with video surveillance cameras, in late 2014, she began lactating in a "lactation room" set up in an empty office space. Two to three other female LAX Marriott employees also used

1. Complaint, Docket No. 1 (May 1, 2015).

2. *Id.*, ¶¶ 50–51; see *id.*, Exh. A ("DFEH Notice"); *id.*, Exh. B ("EEOC Notice").

3. *Id.*, ¶¶ 47–48.

4. Motion to Dismiss Case ("Motion"), Docket No. 21 (June 19, 2015); Request for Judicial Notice by Defendant ("RJN"), Docket No. 23 (June 19, 2015); see also Memorandum in Support of Motion to Dismiss ("Motion Memo"), Docket No. 22 (June 19, 2015); Reply in Support of Motion to Dismiss Case ("Reply"), Docket No. 34 (Sept. 14, 2015).

5. Notice of Reassignment of MJDAP case from Magistrate Judge Charles F. Eick to Judge Margaret M. Morrow, Docket No. 28 (June 30, 2015).

6. Memorandum in Opposition to Motion to Dismiss Case ("Opposition"), Docket No. 33 (Sept. 4, 2015).

7. Complaint, ¶¶ 5–6, 9.

8. *Id.*, ¶¶ 10–12.

9. *Id.*, ¶ 13.

10. *Id.*, ¶¶ 2, 14–15.

11. *Id.*, ¶ 16.

12. *Id.*, ¶ 17.

13. *Id.*, ¶ 18.

the room.[14] Gonzales used her mid-morning and afternoon breaks to express milk in this room for approximately two weeks.[15]

By the end of June 2014, Gonzales's obligation to send breast milk to the child's parents had ended, given logistical concerns about the safety of the shipments. She alleges that she continued to express breast milk, however, due to the personal health benefits of the practice and so that she could donate breast milk to women who were unable to produce sufficient milk for their children.[16] Gonzales asserts she donated her breast milk to such women and also donated milk to Preemies Milk Bank, a charitable organization that provides milk to infants in need.[17]

Gonzales contends that, on June 30, 2014, she was informed by her manager, Dea, that she could take breaks to express milk for another thirty days and that thereafter, she would no longer be accorded the time necessary to do so.[18] On July 1, 2014, Gonzales purportedly emailed the LAX Marriott Market Director of Human Resources, John G. Masamori, and asked to meet with him concerning the matter.[19] On July 18, 2014, Gonzales, Masamori, and other Marriott representatives met; Gonzales told Masamori she had a right to lactation breaks and showed him regulations regarding lactation accommodations, including the Fair Employment and Housing Act.[20] Gonzales asserts that Masamori said, in an allegedly "angry and dismissive" tone, that she did not qualify for accommodation, and that "if [she] had rights, [they would] be talking to [her] lawyer." Nonetheless, he told Gonzales he would check and get back to her.[21]

On August 1, 2014, Gonzales and Masamori met again. Masamori purportedly confirmed his denial of Gonzales's request for a lactation accommodation, stating that she was "not disabled" and was not feeding "a child at home."[22] He told her she could only use her lunch break to express milk.[23] Gonzales alleges that she offered to bring Masamori a doctor's note; he purportedly told her not to bother.[24] On September 11, 2014, Gonzales allegedly stopped taking lactation breaks, and until January 20, 2015, pumped once a day at work during her thirty-minute lunch break.[25]

Gonzales purportedly suffered clogged ducts, severe breast pain and soreness, blisters, and loss of sleep from expressing milk at night because she could not do so during the workday.[26] She asserts she was excluded from company social events at lunch, and suffered "a severe emotional toll" as a result of being treated unfairly, denied her legal rights, and discriminated against due to her "childbearing capacity."[27] Gonzales alleges, on information and belief, that Marriott accommodates other female employees because they are nursing children at home and pays similarly-situated women their normal hourly rate for lactation breaks.[28]

14. *Id.,* ¶¶ 19–21.

15. *Id.,* ¶ 22.

16. *Id.,* ¶¶ 23–24.

17. *Id.,* ¶¶ 25–26.

18. *Id.,* ¶ 27.

19. *Id.,* ¶ 28.

20. *Id.,* ¶ 30.

21. *Id.,* ¶¶ 30–31.

22. *Id.,* ¶¶ 32–34.

23. *Id.,* ¶ 33.

24. *Id.,* ¶ 35.

25. *Id.,* ¶¶ 37–38.

26. *Id.,* ¶ 42.

27. *Id.,* ¶¶ 41, 43.

28. *Id.,* ¶¶ 45–46.

Gonzales pleads the following claims: (1) failure to make reasonable accommodation for a condition related to pregnancy under California Government Code § 12945;[29] (2) failure to make reasonable accommodation for a pregnancy-related condition under 42 U.S.C. § 2000e(k);[30] (3) discrimination on the basis of sex under 42 U.S.C. § 2000e-2;[31] (4) discrimination on the basis of sex under California Government Code § 12945.[32]

## II.  DISCUSSION

### A.  Legal Standard Governing Motions to Dismiss under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens,* 57 F.3d 747, 750 (9th Cir.1995). It need not, however, accept as true unreasonable inferences or legal conclusions cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)). Thus, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' ... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); see also *Twombly,* 550 U.S. at 545, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service,* 572 F.3d 962, 969 (9th Cir.2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly* ).

As the Ninth Circuit has explained: "First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and

---

**29.** *Id.,* ¶¶ 51–59.

**30.** *Id.,* ¶¶ 60–68.

**31.** *Id.,* ¶¶ 70–81.

**32.** *Id.,* ¶¶ 82–91.

continued litigation." *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir.2011).

### B. Defendants' Requests for Judicial Notice

█ Marriott asks the court take judicial notice of two documents: (1) copies of the legislative analysis and amendments to Assembly Bill 1025 from the 2001/2002 Session of the California Senate and Assembly;[33] and (2) a notice released by the United States Department of Labor, Wage and Hour Division, titled "Reasonable Break Time for Nursing Mothers," 75 Fed. Reg. 80078 (Dec. 21, 2010).[34]

█ In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). A court must normally convert a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment if it "considers evidence outside the pleadings. . . . A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie,* 342 F.3d 903, 907–08 (9th Cir.2003). See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (a court may consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

Under Rule 201, the court can judicially notice "[o]fficial acts of the legislative, executive, and judicial departments of the United States," and "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." Federal courts routinely take judicial notice of the legislative history of both federal and California statutes. See, e.g., *Sprint PCS Assets v. City of La Canada Flintridge,* 435 F.3d 993, 997 (9th Cir.2006) (taking judicial notice of the legislative history of a California Public Utilities Code section); *Chaker v. Crogan,* 428 F.3d 1215, 1223, n. 8 (9th Cir.2005) (granting plaintiff's request to take judicial notice of the legislative history of California Penal Code § 148.6); *Louie v. McCormick & Schmick Rest. Corp.,* 460 F.Supp.2d 1153, 1155–56, n. 4 (C.D.Cal.2006) (taking judicial notice of certain portions of the legislative history of California Labor Code § 351 in considering a motion to dismiss). The court will thus take judicial notice of the first document that is the subject of Marriott's request.

Courts have also held that "[j]udicial notice is appropriate for records and 'reports of administrative bodies.'" *United States v. 14.02 Acres of Land More or Less in Fresno County,* 547 F.3d 943, 955 (9th Cir.2008) (quoting *Interstate Natural Gas Co. v. Southern California Gas Co.,* 209 F.2d 380, 385 (9th Cir.1953)). The court will therefore take judicial notice of the second document, and will *sua sponte* take judicial notice of section I(A)(4)(b) of the EEOC's Enforcement Guidance on Pregnancy Discrimination and Related Issues.[35]

---

33. Request for Judicial Notice ("RJN"), Exh. A, Docket No. 23 (June 19, 2015).

34. RJN, Exh. B.

35. EEOC Enforcement Guidance on Pregnancy Discrimination and Related Issues (July 14, 2014), available at http://www.eeoc.gov/laws/guidance/pregnancy_guidance.cfm.

## C. Whether Gonzales's Claim for Failure to Make Reasonable Accommodation for a Condition Related to Pregnancy Under California Government Code § 12945(a)(3)(A) Must Be Dismissed

Gonzales's first cause of action alleges that Marriott violated California Government Code § 12945(a)(3)(A) ("FEHA") by denying her request to take two lactation breaks at work.[36] FEHA makes it unlawful "for an employer to refuse to provide reasonable accommodation for an employee for a condition related to pregnancy, childbirth, or a related medical condition, if she so requests, with the advice of her healthcare provider." CAL. GOV'T CODE § 12945(a)(3)(A). Lactation is considered a "condition related to pregnancy, childbirth, or a related medical condition." 2 CAL. CODE REG. § 11035(d).

■ To state a pregnancy discrimination claim for failure to accommodate under FEHA, Gonzales must allege that (1) her employer refused a reasonable accommodation (2) for a pregnancy-related condition (3) requested by an employee affected by pregnancy (4) with the advice of her health care provider. See Mayfield v. Trevors Store, Inc., No. C–04–1483 MHP, 2004 WL 2806175, *5 (N.D.Cal. Dec. 6, 2004); see also Graves v. Pau Hana Group, LLC, No. 2:13–CV–01278–JAM, 2013 WL 6000986, *6 (E.D.Cal. Nov. 12, 2013) ("the essential elements of a failure to accommodate claim under section 12945(a)(3)(A) which have been considered by the Court are: (1) Plaintiff had a condition related to pregnancy, childbirth, or a related medical condition; (2) Plaintiff was a qualified individual in that she could perform the essential functions of the job; (3) Plaintiff was refused a reasonable accommodation; and (4) the accommodation was requested with the advice of a health care provider" (internal quotes omitted)).

Gonzales argues that she has stated a claim for pregnancy discrimination because she requested an accommodation from her employer for a pregnancy-related condition,[37] and offered to provide documentation from her health care provider of the necessity for the accommodation.[38] Her

36. Complaint, ¶ 58.

37. See Complaint, ¶¶ 17, 30, 36

38. Id., ¶ 35. At the hearing, Marriott argued that Gonzales had not shown that she was entitled to reasonable accommodation because she had not alleged sufficient facts to demonstrate that the "qualifying condition" that must be accommodated under FEHA and its regulations had not terminated. Marriott did not identify what it believed the "qualifying condition" was. At times, it seemed to define the "qualifying condition" as lactation for the purpose of feeding the employee's own infant child. In response to questions from the court, however, Marriott appeared to define "qualifying condition" as lactation ordered by a doctor for the health of the mother.

FEHA requires that an employee with a condition related to pregnancy, childbirth or a related medical condition request an accommodation on the advice of her health care provider. Graves, 2013 WL 6000986 at *6 ("the essential elements of a failure to accommodate claim under section 12945(a)(3)(A) which have been considered by the Court are: (1) Plaintiff had a condition related to pregnancy, childbirth, or a related medical condition; (2) Plaintiff was a qualified individual in that she could perform the essential functions of the job; (3) Plaintiff was refused a reasonable accommodation; and (4) the accommodation was requested with the advice of a health care provider" (internal quotes omitted)). Contrary to Marriott's argument, Gonzales has alleged sufficient facts to support a reasonable inference that she received such advice. Gonzales pleads that she offered to provide a note from her doctor concerning the need for continued lactation, but that Marriott told her "not to bother." (Complaint, ¶ 35.) The fact that Gonzales made the offer is circumstantial evidence that her physician either had, or would, recommend continued lactation. Such an inference is also supported by Gonzales' allegation that because she was unable to express breast milk

employer purportedly denied her request, and refused to consider any documentation her healthcare provider might have supplied.[39] Marriott contends that the plain language, legislative history, and public policy considerations underlying California Labor Code § 1030 limit the lactation accommodation requirements prescribed by FEHA to employees who express breast milk for their own infant children.[40]

### 1. Whether the Plain Language of FEHA and California Labor Code § 1030 Limits Employers' Obligation to Make Reasonable Accommodation to Employees Who Express Breast Milk for Their Own Children

"The first and most important step in construing a statute is the statutory language itself." *Royal Foods Co., Inc. v. RJR Holdings, Inc.*, 252 F.3d 1102, 1106 (9th Cir.2001). "Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *BP America Production Co. v. Burton*, 549 U.S. 84, 91, 127 S.Ct. 638, 166 L.Ed.2d 494 (2006). If the text of the statute is clear, legislative history and other indicia of legislative intent cannot be used to depart from the plain meaning of the text. *Milner v. Department of Navy*, 562 U.S. 562, 572, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text. We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language"); *United States v. Harrell*, 637 F.3d 1008, 1010 (9th Cir.2011)

("As in any case of statutory construction, our analysis begins with the language of the statute. And where the statutory language provides a clear answer, it ends there as well," citing *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (internal quotation marks omitted)); see also *Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("The starting point in discerning congressional intent is the existing statutory text. . . . It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms' ").

Government Code § 12945 makes it unlawful "for an employer to refuse to provide reasonable accommodation for an employee for a condition related to pregnancy, childbirth, or a related medical condition, if she so requests, with the advice of her healthcare provider." CAL. GOV'T CODE § 12945(a)(3)(A). The California Code of Regulations, title 2, § 11035(s), defines a " 'reasonable accommodation' of an employee affected by pregnancy" as "any change in the work environment or in the way a job is customarily done that is effective in enabling an employee to perform the essential functions of a job." 2 CAL. CODE REG. § 11035(s).

The regulations state that a "[r]easonable accommodation may include, but is not limited to an employer ... providing a reasonable amount of break time and use of a room or other location in close proximity to the employee's work area to express

---

at work, she developed clogged ducts and experienced severe breast pain and other physical symptoms. (*Id.*, ¶ 42.) Consequently, the court concludes that this element has been adequately pled.

**39.** *Id.*, ¶¶ 27, 30, 33–35.

**40.** Marriott also asserts that its accommodation complied with FEHA and was reasonable as a matter of law. Because Marriott makes this argument as respecting 42 U.S.C. § 2000e(k) as well, the court addresses reasonable accommodation under the two statutes below.

breast milk in private as set forth in Labor Code section 1030 et seq." 2 CAL. CODE REG. § 11035(s)(5).

Labor Code § 1030 provides:

"Every employer ... shall provide a reasonable amount of break time to accommodate an employee desiring to express breast milk for the employee's infant child. The break time shall, if possible, run concurrently with any break time already provided to the employee. Break time for an employee that does not run concurrently with the rest time authorized for the employee by the applicable wage order of the Industrial Welfare Commission shall be unpaid." CAL. LAB. CODE § 1030.

Marriott contends that because Labor Code § 1030 includes the phrase "accommodate an employee desiring to express breast milk *for the employee's infant child,*" the legislature did not mean to require that employers accommodate employees who wish to express milk for other reasons, e.g., to benefit the health of the mother or to donate/sell expressed breast milk.

Marriott's narrow focus on the language of Labor Code § 1030, as opposed to title 2, § 11035(s) of the California Code of Regulations, which directly interprets FEHA, is misguided. The plain language of § 11035(s) makes clear that compliance with Labor Code § 1030 is but one example in a non-exhaustive list of accommodation options. Section 11035(s) states that the listed accommodations "may" be reasonable, and that the range of possible reasonable accommodations "includes, but is not limited to" those identified in the regulation. The list included in § 11035(s) must therefore be interpreted broadly, i.e., complying with Labor Code § 1030 is one of many options, and the reasonableness of the employer's conduct is to be judged by considering the employee's and employer's individual circumstances. See also CAL.

GOV'T CODE § 12993(a) ("The provisions of this part shall be construed liberally for the accomplishment of the purposes of this part"); *Robinson v. Fair Employment & Housing Comm.,* 2 Cal.4th 226, 243, 5 Cal. Rptr.2d 782, 825 P.2d 767 (1992) ("Because the FEHA is remedial legislation, which declares '[t]he opportunity to seek, obtain and hold employment without discrimination' to be a civil right (§ 12921), and expresses a legislative policy that it is necessary to protect and safeguard that right (§ 12920), the court must construe the FEHA broadly, not, as plaintiff suggests, restrictively"); *Hirst v. City of Oceanside,* 236 Cal.App.4th 774, 791, 187 Cal.Rptr.3d 119 (2015) (noting the "well-settled rule that courts must broadly construe FEHA provisions to implement the legislative intent to provide protections to workers and end the practice of sexual (and other forms of) harassment in the workplace, and to hold those with the ability and authority to prevent and remedy the situation responsible for addressing the problem"); *Fitzsimons v. California Emergency Physicians Med. Group,* 205 Cal.App.4th 1423, 1429–30, 141 Cal.Rptr.3d 265 (2012) ("Because the FEHA is remedial legislation, which declares [t]he opportunity to seek, obtain and hold employment without discrimination to be a civil right (§ 12921), and expresses a legislative policy that it is necessary to protect and safeguard that right (§ 12920), the court must construe the FEHA broadly, not ... restrictively," quoting *Kelly v. Methodist Hospital of So. California,* 22 Cal.4th 1108, 1114, 95 Cal.Rptr.2d 514, 997 P.2d 1169 (2000) (internal quotation marks omitted)); *Bagatti v. Dep't of Rehab.,* 97 Cal.App.4th 344, 363, 118 Cal.Rptr.2d 443 (2002) ("Finally, we are reminded that section 12993, subdivision (a) commands that, 'The provisions of this part [of the FEHA] shall be construed liberally for the accomplishment of the purposes of this part,' " quoting CAL. GOV'T CODE § 12993(a)).

Marriott asserts that interpreting FEHA in this manner renders portions of Labor Code § 1030 surplusage. See *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)("A court must give effect, if possible, to every clause and word of a statute"); *Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing this rule as a "cardinal principle of statutory construction").

■ Marriott fails to consider the interaction between FEHA, its interpreting regulations, and Labor Code § 1030. Title 2, § 11035(s) of the California Code of Regulations states that the range of possible accommodations is not limited to the specific accommodations described therein. Where a regulation provides a non-exhaustive list of options or examples, it does not limit acceptable practices to those identified, but merely suggests examples from which other options can be extrapolated. Here, therefore, the applicable regulation does not limit the range of reasonable accommodations to compliance with Labor Code § 1030, but offers such compliance as an example of the type of reasonable accommodations that may be appropriate in an individual case. See *Graves*, 2013 WL 6000986 at *6 (holding that failure to prevent harassment or abuse did not constitute a failure to provide a reasonable accommodation because "the enumerated accommodations are of a different kind than the 'accommodation' contemplated by Plaintiff"). Contrary to Marriott's argument, interpreting FEHA and its regulations in this manner does not render any portion of Labor Code § 1030 surplusage. While one way in which an employer can provide a reasonable accommodation under FEHA is to comply with Labor Code § 1030, that is not the only way.

This interpretation of FEHA and its implementing regulations does not, as Marriott argues, render the phrase "for the employee's infant child" in Labor Code § 1030 surplusage. The Labor Code provision, which applies to all employers no matter their size, delineates the accommodations employers must offer to avoid civil penalties and citations. See CAL. LAB. CODE § 1033 ("An employer who violates [Labor Code § 1030] shall be subject to a civil penalty in the amount of one hundred dollars ($100) for each violation ... [and] the Labor Commissioner may issue a citation"). FEHA's mandate is broader. That statute gives individual employees the right to recover compensatory damages if their employers fail, *inter alia*, reasonably to accommodate "a condition related to pregnancy, childbirth, or a related medical condition, if she so requests, with the advice of her healthcare provider."

The Labor Code's penalty provisions were enacted to improve enforcement of California's labor laws. See *Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal.4th 348, 387, 173 Cal.Rptr.3d 289, 327 P.3d 129 (2014) ("We emphasized in *Arias* that 'an action to recover civil penalties is fundamentally a law enforcement action designed to protect the public and not to benefit private parties,'" quoting *Arias v. Superior Court*, 46 Cal.4th 969, 986, 95 Cal.Rptr.3d 588, 209 P.3d 923 (2009)); see also *Caliber Bodyworks, Inc. v. Superior Court*, 134 Cal.App.4th 365, 370, 36 Cal. Rptr.3d 31 (2005) (noting that the "stated goal" of the Private Attorneys General Act of 2004 was "improving enforcement of existing Labor Code obligations").[41]

---

41. The *Caliber Bodyworks* court distinguished between a "statutory penalty," recoverable directly by the employee, and a "civil penalty," "previously enforceable only by the State's

labor law enforcement agencies." 134 Cal. App.4th at 377, 36 Cal.Rptr.3d 31. Labor Code § 1033 makes clear that the penalty for violating Labor Code § 1030 is a "civil penal-

FEHA, by contrast, was enacted "to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status." CAL. GOV'T CODE § 12920.

Statutes that concern the same subject matter are generally construed together. *People v. Honig,* 48 Cal.App.4th 289, 327, 55 Cal.Rptr.2d 555 (1996). Such laws are commonly referred to as statutes *"in pari materia."* As the authors of Sutherland on Statutory Construction note, "[c]haracterization of the object or purpose [of the statutes] is more important than characterization of subject matter to determine whether different statutes are closely enough related to justify interpreting one in light of the other." N. Singer and S. Singer, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION, § 51.3 (7th ed.2014). Among the things courts consider in determining whether two statutes concern the same object is whether they "are contained in the same legislative act, the same elements of proof are required by the two statutes, they involve different penalties, and they were obviously designed to serve the same purpose and objective." *Id.* Here, the purpose and objective of the Labor Code and the FEHA are distinct. They were not contained in the same legislative act, and different elements of proof are required to prove claims under FEHA and Labor Code § 1030 as well. As a result, the court cannot conclude that they are *in pari materia.*

Other rules of statutory construction support this result. " 'Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed.' " *City of Port Hueneme v. City of Oxnard,* 52 Cal.2d 385, 395, 341 P.2d 318 (1959); accord *Committee of Seven Thousand v. Superior Court,* 45 Cal.3d 491, 507, 247 Cal.Rptr. 362, 754 P.2d 708 (1988). FEHA's "purpose[, moreover,] was not to narrow, but to expand the rights and remedies available to victims of discrimination." *Rojo v. Kliger,* 52 Cal.3d 65, 82, 276 Cal.Rptr. 130, 801 P.2d 373 (1990); see also *Schifando v. City of Los Angeles,* 31 Cal.4th 1074, 1083, 6 Cal.Rptr.3d 457, 79 P.3d 569 (2003); *City of Moorpark v. Superior Court,* 18 Cal.4th 1143, 1157, 77 Cal.Rptr.2d 445, 959 P.2d 752 (1998). Thus, while in some instances, the operation of the Labor Code and FEHA may overlap, applying the expansive language of FEHA as written in a civil suit for compensatory damages does not render Labor Code § 1030 surplusage. Cf. *In re White,* 1 Cal.3d 207, 212, 81 Cal.Rptr. 780, 460 P.2d 980 (1969) ("The courts are bound, if possible, to maintain the integrity of both statutes if the two may stand together"). See also *In re Marriage of Brown,* 99 Cal.App.3d 702, 706, 160 Cal.Rptr. 524 (1979) ("The apparent inconsistency in the statutes does not amount to a fatal conflict, despite the fact that section 199 is the most recent of the three enactments").

Marriott contends that for public policy reasons, the court should limit the accommodation prescribed by FEHA to the lactation break requirements of California Labor Code § 1030; specifically, it asserts

---

ty." See CAL. LAB. CODE § 1033(a) ("An employer who violates any provision of this chapter shall be subject to a *civil penalty* in the amount of one hundred dollars ($100) for each violation" (emphasis added)).

the court should find that employers need only accommodate women expressing breast milk for their own children, and also that employers are not required to provide paid breaks for women expressing breast milk. See CAL. LAB. CODE § 1030 ("Break time for an employee that does not run concurrently with the rest time authorized for the employee by the applicable wage order of the Industrial Welfare Commission shall be unpaid"). Gonzales alleges that Marriott's refusal to provide breaks violates the FEHA and the Pregnancy Discrimination Act whether the breaks were paid or unpaid.[42] Nonetheless, the court addresses Marriott's argument below.

Marriott asserts that unless an employer's obligation under FEHA is limited to providing unpaid breaks to employees who wish to express milk for their own child, employees could lactate indefinitely, and force their employer to pay them for a significant amount of non-work time, as the result of "a condition artificially maintained for [the employee's] own personal objectives."[43] While there is often tension between accommodating workers and the burden such accommodations place on employers, the "reasonable accommodation" standard balances the competing interests of employees and employers appropriately. See 2 CAL. CODE REG. § 11040 (determining whether an accommodation is reasonable requires "a factual determination ... made on a case-by-case basis, taking into consideration such factors, including but not limited to, the employee's medical needs, the duration of the needed accommodation, the employer's legally permissible past and current practices, and other such factors, under the totality of the circumstances"). Marriott's argument concerning the length of time employers must accommodate lactating employees and whether lactation breaks should be paid or unpaid are questions of fact for the jury to decide in determining what accommodation is reasonable under the facts and circumstances of this case.[44]

As for Marriott's argument that once Gonzales stopped sending expressed milk to the child's mother in June 2014, no further accommodation should have been required as a matter of public policy, this is a question that cannot be answered in the context of a motion to dismiss. First, Gonzales may be able to adduce evidence that there were health reasons that led her physician to recommend continued lactation. Second, whether it is "reasonable" to require an employer to accommodate an employee's desire to express milk that she intends to donate or sell is a question of fact for the jury. See *Auburn Woods I Homeowners Assn. v. Fair Employment & Housing Comm.*, 121 Cal.App.4th 1578, 1595, 18 Cal.Rptr.3d 669 (2004); *Prilliman*

---

**42.** Opposition at 23 ("In fact, Defendants' refusal to provide her with mandatory breaks, *paid or unpaid,* constitutes an adverse employment action under FEHA" (emphasis added)). At the hearing, Gonzales confirmed that her FEHA and Pregnancy Discrimination Act disparate treatment claims concern Marriott's failure to provide *even unpaid* breaks. Counsel stated: "The accommodation claim deals with the provision of breaks [whether paid or unpaid] and the [sex stereotyping] *discrimination* claim is more accurately concerned with the fact that she was not receiving paid breaks. There's obviously overlap here in the facts, but I think that distinction is an important one."

**43.** Motion at 9–10.

**44.** Moreover, as Gonzales clarified at the hearing, she sought paid breaks because employees lactating to provide breast milk to their own children received paid breaks. (See Complaint, ¶ 46.) She asserted, and the court understood her complaint to allege, that she believed she was entitled to paid breaks because other lactating employees were receiving paid breaks, and to deny them to her was a form of discrimination. (See *id.*, ¶ 79.)

*v. United Air Lines, Inc.,* 53 Cal.App.4th 935, 953–54, 62 Cal.Rptr.2d 142 (1997).

**2. Whether the Legislative History of Labor Code § 1030 Demonstrates a Legislative Intent to Require Employers to Accommodate Only Employees Who Express Breast Milk for Their Own Children**

■ Marriott next argues that the legislative history of Labor Code § 1030 indicates that the California legislature intended to require employers to accommodate only those employees who express milk for their own children. The legislative history of Labor Code § 1030 that Marriott proffers, however, does not reveal any legislative intent to *exclude* employees who are not nursing their own children from seeking accommodation to express breast milk at work. Under California law, " 'our fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' " *Edgerly v. City & County of San Francisco,* 713 F.3d 976, 983 (9th Cir.2013) (quoting *Martinez v. Combs,* 49 Cal.4th 35, 51, 109 Cal.Rptr.3d 514, 231 P.3d 259 (2010)); see also *Building Industry Ass'n v. Camarillo,* 41 Cal.3d 810, 819, 226 Cal.Rptr. 81, 718 P.2d 68 (1986) ("The cardinal rule of statutory construction is to ascertain and give effect to the intent of the Legislature"). "[I]f the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory

construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy." *Edgerly,* 713 F.3d at 983 (quoting *Martinez,* 49 Cal.4th at 51, 109 Cal.Rptr.3d 514, 231 P.3d 259).

Marriott contends that interpreting California's law on lactation accommodation as Gonzales wishes would contravene the legislature's intent in enacting Labor Code § 1030. It asserts the legislative history of that statute confirms that it was not intended to require employers to provide lactation breaks for women who wish to use paid time to express milk that they can sell or donate to milk banks, but rather to permit working mothers to continue to nurture their infants with breast milk. It cites numerous excerpts from the legislative history, which mention that a purpose of expressing breast milk is to benefit the employee's infant child.

Proffering evidence that the legislature considered one reason why lactation at work should be permitted does not demonstrate that it intended to exclude others, however. The legislative history notes the health benefits of lactation for a woman who has given birth, for example; these are present whether the woman's own child or another receives the expressed milk. Although Marriott does not mention portions of the legislative history that discuss experts' opinions concerning the health benefits of expressing milk for the woman giving birth, this was clearly an important consideration the legislature took into account.[45]

---

45. See, e.g., RFJ, Exh. A at 2 ("This bill would require employers to provide a reasonable amount of unpaid break time to employees desiring to express milk"); *id.* at 23 ("[C]urrently, employers are not required to give lactating mothers any break time or a proper facility to express breast milk. Working, breastfeeding mothers must use bathroom stalls or hide in supply closets while pumping breast milk. If a woman is prevented from expressing milk, infections can poten-

tially develop and she can stop producing milk"); *id.* at 24 (considering the comments of the American College of Obstetricians and Gynecologists supporting the measure, which stated that the "bill will encourage working women to continue the health practice of providing breast milk to their infant children"); *id.* at 25 ("The author states that employers are not required presently to give lactating mothers any extra break time or a proper

Marriott does not cite, nor has the court located in the legislative history, any statements that suggest an intent to interpret an entirely different statute (FEHA) in a way that limits the range of employer accommodations required for women who are lactating to those expressing breast milk for their own children. Marriott does not cite any legislative history regarding the applicable provisions of FEHA. Even if one assumes that the legislature intended to mandate only a limited accommodation when it enacted Labor Code § 1030, there is evidence that the legislature had a broader, more protective goal in mind when it enacted FEHA. *Spaziano v. Lucky Stores, Inc.*, 69 Cal.App.4th 106, 113, 81 Cal.Rptr.2d 378 (1999) ("The common goal of Title VII and FEHA is to end discrimination against pregnant workers" (internal quotation marks omitted)). Given FEHA's overarching purpose, the court cannot interpret the statute and its implementing regulations in the narrow manner advocated by Marriott.

### D. Whether Gonzales's Disparate Treatment Claim Under 42 U.S.C. § 2000e(k) Must Be Dismissed

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of ... sex." 42 U.S.C.

facility to express breast milk. If a woman is prevented from expressing milk, infections can potentially develop and she can stop producing milk. This bill would encourage working women to continue the healthy practice of providing breast milk to their infant children"); *id.* at 29 (hearing comments by the California Conference of Machinists, which stated that "some employers prohibit working mothers from taking breaks to express and store breast milk [and that] [t]hey were, in essence, forced to give up breast feeding because failing to express breast milk diminishes milk production and is very painful"). See also California Assembly Concurrent Resolution 155 (1998) ("Extensive re-

§ 2000e-2(a)(1). The Pregnancy Discrimination Act ("PDA") clarifies that "because of sex" includes "because of or on the basis of pregnancy, childbirth, or other related medical conditions," and requires that "women affected by pregnancy, child-birth, or other related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k).

To establish a prima facie case of discrimination, a plaintiff must plead and prove: "(1) that the plaintiff belongs to a class of persons protected by Title VII or FEHA; (2) that the plaintiff performed ... her job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

Gonzales asserts two claims under 42 U.S.C. § 2000e(k). The first alleges that by making reasonable accommodation for other employees with disabilities or medical conditions but not for her, Marriott discriminated against her based on a pregnancy-related medical condition.[46] The

search, especially in recent years, documents diverse and compelling advantages to infants, mothers, families, and society from breast-feeding and the use of human milk for infant feeding, including health, nutritional, immunologic, developmental, psychological, social, economic, and environmental benefits"). Given the discussion in the legislative history of the health benefits of lactating and the potential negative health impacts of not doing so, Marriott's dismissal of the "'personal health benefits" of lactation—which it compares to "exercising during the workday"—is unfounded. (See Motion at 9–10.)

46. *Id.*, ¶¶ 66–67.

second alleges sex stereotyping.

1. **Whether the Fact That Marriott Permitted Other Women to Take Lactation Breaks Defeats Gonzales's Claims As a Matter of Law**

As a threshold matter, Marriott argues that Gonzales's discrimination claims must be dismissed because it permitted other female employees to express milk at work. Because these employees were in the same protected class as Gonzales, Marriott asserts that she cannot state a sex discrimination claim as a matter of law.

The premise of Marriott's argument has been rejected by the Ninth Circuit in an analogous context. In *Diaz v. American Telephone & Telegraph*, 752 F.2d 1356 (9th Cir.1985), the court considered a grant of summary judgment in favor of an employer by the district court. The district court had concluded that Diaz could not state a discrimination claim under *McDonnell Douglas Corp.*, 411 U.S. 792, 93 S.Ct. 1817, because the individual promoted to the position plaintiff sought was a member of the same protected class as Diaz. *Diaz*, 752 F.2d at 1359. The Ninth Circuit stated:

"In order to preclude a plaintiff from recovery in all cases in which the challenged position is filled by a member of the same protected class, we would have to assume that Title VII protects only group rights. It is, of course, true that Title VII was designed to deter and remedy discrimination on the basis of group characteristics and to remove barriers that favor certain groups over others. But, at the same time, Title VII's focus on the rights of individual members of protected classes is 'unambiguous.' It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group. Title VII protects individuals, as well as groups, from discrimination on the basis of group characteristics." *Id.* at 1360 (internal quotations marks and citations omitted).

See also *Connecticut v. Teal*, 457 U.S. 440, 455, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) ("It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group"); see also *Peters v. Lieuallen*, 693 F.2d 966, 970 (9th Cir.1982) ("The fact that a particular screening device admits some members of a protected class into pool of job candidates does not demonstrate an absence of discrimination"). As a result, the *Diaz* court reversed the district court. *Diaz*, 752 F.2d at 1361.

Although *Diaz* and other Ninth Circuit cases citing it address whether a discrimination plaintiff can make out a *prima facie* case of discrimination under *McDonnell Douglas*, and not whether an employer accommodated some employees with a similar disability but not plaintiff, the court believes the Ninth Circuit's comments are instructive. As both the *Diaz* court and the Supreme Court in *Teal* noted, "Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group." *Teal*, 457 U.S. at 455, 102 S.Ct. 2525; *Diaz*, 752 F.2d at 1360. The court thus cannot find that the fact that Marriott affords breaks to women expressing breast milk for their own children defeats Gonzales's claim as a matter of law.

2. **Whether Title VII Mandates the Provision of a Reasonable Accommodation**

Marriott next argues that although § 2000e(k) bars discrimination on the basis of sex, including discrimination on the ba-

sis of pregnancy, childbirth or related medical conditions, it does not mandate the provision of a reasonable accommodation. The PDA requires that "women affected by pregnancy, child-birth, or other related medical conditions ... be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability to work." 42 U.S.C. § 2000e(k).

While the statute does not expressly mandate that employers make reasonable accommodations for pregnant workers, as FEHA does, it does require that employers accommodate pregnant women or those affected by related medical conditions to the same extent that they accommodate other workers, absent a nondiscriminatory reason for doing so.

> "A plaintiff claiming pregnancy discrimination for a failure to accommodate must show only that she belongs to the protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did accommodate others similar in their ability or inability to work. The employer may then seek to justify its refusal to accommodate the plaintiff by relying on legitimate, nondiscriminatory reasons for denying her accommodation. But, consistent with the Act's basic objective, that reason normally cannot consist simply of a claim that it is more

expensive or less convenient to add pregnant women to the category of those (similar in their ability or inability to work) whom the employer accommodates." *Young v. United Parcel Serv., Inc.,* —— U.S. ——, 135 S.Ct. 1338, 1354, 191 L.Ed.2d 279 (2015) (internal quotation marks omitted).

The EEOC recently confirmed this, stating that an employee who is lactating "must have the same freedom to address such lactation-related needs that she and her co-workers would have to address other similarly limiting medical conditions." EEOC ENFORCEMENT GUIDANCE ON PREGNANCY DISCRIMINATION AND RELATED ISSUES, § I(A)(4)(b) (July 14, 2014).[47]

▆ Gonzales has sufficiently alleged that she is a member of a protected class of women affected by pregnancy-related conditions, that she sought accommodation for her pregnancy-related condition, and that she was denied an accommodation.[48] She further alleges not only that other lactating employees were allowed breaks but that defendants "accommodate other employees with disabilities or medical conditions that require reasonable accommodations, including breaks, during the workday."[49] Consequently, she has sufficiently alleged all of the elements of a § 2000e(k) claim.

---

**47.** The cases that Marriott cites have been explicitly or implicitly overruled. *Young* specifically abrogated *Urbano v. Cont'l Airlines, Inc.,* 138 F.3d 204, 207 (5th Cir.1998). *Young,* 135 S.Ct. 1338. The remaining cases, *Falk v. City of Glendale,* No. 12–cv–00925–JKL, 2012 WL 2390556, at *4 (D.Colo. June 25, 2012) (the PDA does not compel employers to affirmatively provide accommodations, and the plaintiff failed to allege differential treatment), and *E.E.O.C. v. Vamco Sheet Metals, Inc.,* No. 13 Civ. 6088(JPO), 2014 WL 2619812, *6 (S.D.N.Y. June 5, 2014) ("Where a plaintiff's claim focuses on adverse employment actions or conditions relating to her

lactation breaks, as opposed to an alleged failure to accommodate a disability, an employer may be liable under Title VII"), also rely on a rule of law that is no longer valid post-*Young.*

**48.** See Complaint, ¶¶ 14, 16, 17, 33–35, 44–45. Marriott argues at great length that Gonzales has failed to state a claim under 29 U.S.C. § 207(r). The complaint contains no such claim, however, and the court need not address the matter as a result.

**49.** *Id.,* ¶ 66.

### E. Whether Marriott Reasonably Accommodated Gonzales Under FEHA and 42 U.S.C. § 2000e(k)

Marriott next argues that Gonzales has not adequately pled that it denied her a reasonable accommodation. It asserts that permitting Gonzales to lactate during statutorily required meal periods and rest breaks was a sufficiently reasonable accommodation as a matter of law because "[a]n employer is not required to choose the best accommodation or the specific accommodation the employee seeks." *Wilson v. County of Orange*, 169 Cal.App.4th 1185, 1194, 87 Cal.Rptr.3d 439 (2009) (citing *Hanson v. Lucky Stores, Inc.*, 74 Cal. App.4th 215, 228, 87 Cal.Rptr.2d 487 (1999); *Holtzclaw v. Certainteed Corp.*, 795 F.Supp.2d 996, 1018 (E.D.Cal.2011)). As a result, Marriott argues, even if FEHA and 42 U.S.C. § 2000e(k) apply, it satisfied its obligations to accommodate her under those statutes as a matter of law.

It is true that the employer has the "ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." *Wilson*, 169 Cal.App.4th at 1194, 87 Cal.Rptr.3d 439. Under both state and federal law, whether the accommodation Marriott offered Gonzales is reasonable, however, is, as noted, a question of fact for the jury. *Auburn Woods I Homeowners Assn.*, 121 Cal.App.4th at 1595, 18 Cal. Rptr.3d 669; *Prilliman*, 53 Cal.App.4th at 953–54, 62 Cal.Rptr.2d 142; 2 Cal. Code Reg. § 11040 (determining whether an accommodation is reasonable requires "a factual determination ... made on a case-by-case basis, taking into consideration such factors, including but not limited to, the employee's medical needs, the duration of the needed accommodation, the employer's

legally permissible past and current practices, and other such factors, under the totality of the circumstances"); *U.S. EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1110 (9th Cir.2010) ("The reasonableness of an accommodation is ordinarily a question of fact," quoting *Lujan v. Pac. Mar. Ass'n*, 165 F.3d 738, 743 (9th Cir.1999)); *EEOC v. Univ. Mfg. Corp.*, 914 F.2d 71, 73 (5th Cir.1990) ("There may have been a reasonable means, such as allowing her to swap shifts, in which Universal could have accommodated Parker's religiously required forbearance from work for one week a year. That is a question of fact"). Cf. *Tapia v. Artistree, Inc.*, No. CV 14–01381 DDP (ASx), 2014 WL 1402306, *3 (C.D.Cal. Apr. 10, 2014) (while providing leave can be a reasonable accommodation for pregnancy, an employer does not satisfy its burden of offering a reasonable accommodation by presenting a single type of accommodation and failing to consider whether alternative accommodations are also available).

Gonzales alleges that Marriott told her she was no longer allowed to take breaks to express milk and that she had thirty days stop expressing breast milk.[50] When she continued doing so over her lunch break, Marriott purportedly forbade her from eating lunch in the lactation room.[51] These allegations, accepted as true, raise factual issues as to whether Marriott's claimed accommodations were reasonable that cannot be decided as a matter of law. Thus, Gonzales's claim cannot be dismissed on this basis.

### F. Whether Gonzales's Sex Stereotyping Claim Under 42 U.S.C. § 2000e(k) and FEHA Must Be Dismissed

Title VII makes it unlawful for an employer to "discriminate against any individ-

---

**50.** Complaint, ¶ 27.

**51.** *Id.*, ¶ 39.

ual ‚with respect to [her] compensation, terms, conditions, or privileges of employment, because of ... sex." 42 U.S.C. § 2000e–2(a)(1). Similarly, FEHA prohibits an employer from discriminating against a person in compensation or in the terms, conditions, or privileges of employment because of sex or gender. CAL. GOV'T CODE § 12940(a).

■■■■ Impermissible sex stereotyping is considered sex discrimination under Title VII where the plaintiff's non-conformity with traditional gender roles informed an adverse employment action. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), superseded by statute on other grounds, as stated in *Stender v. Lucky Stores, Inc.*, 780 F.Supp. 1302 (N.D.Cal. 1992). See also *Latta v. Otter*, 771 F.3d 456, 486 (9th Cir.2014), cert. denied, —— U.S. ——, 135 S.Ct. 2931, 192 L.Ed.2d 975 (2015); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 874 (9th Cir.2001) (harassment against a person for "failure to conform to [sex] stereotypes" is gender-based discrimination). To state a sex stereotyping claim, a plaintiff must provide "evidence of stereotypical motivation on the part of the employer." *Jespersen v. Harrah's Operating Co., Inc.*, 444 F.3d 1104, 1113 (9th Cir.2006). This can be demonstrated through statements made by the employer that directly concern the employee's gender or by the timing of the

adverse employment action if it occurred shortly after plaintiff began exhibiting non-stereotypical behavior. *Id.*; *Nichols*, 256 F.3d at 874.

Gonzales alleges that Marriott is liable for sex stereotyping under Title VII and FEHA,[52] because it made reasonable accommodations for other recently-pregnant employees, but not for Gonzales because she was a gestational surrogate. Gonzales contends that her role as a surrogate does not conform to traditional stereotypes concerning motherhood, including attachment to an infant child at home.[53] As a result of this purported stereotyping, she alleges she suffered adverse employment action, i.e., she was denied access to paid breaks, which resulted in a daily loss of monetary compensation, physical and emotional pain and inconvenience, and exclusion from the social privilege of lunch breaks and lunchtime social events with co-workers.[54] Marriott counters that sex stereotyping is not a viable legal theory because the "stereotype of legitimate motherhood" is not a sex-based stereotype.

## 1. Whether the Sex Stereotype Theory of Title VII Liability is Applicable to Gonzales's Case

■■ In *Jespersen*, a female employee was terminated for refusing to comply with Harrah's dress code; the dress code included grooming standards for women and grooming standards for men. One of the

---

**52.** There appears to be few California appellate decisions that have substantively analyzed a sex stereotyping claim. The California Supreme Court recognized the theory, however, in *Harris v. City of Santa Monica*, 56 Cal.4th 203, 229, 152 Cal.Rptr.3d 392, 294 P.3d 49 (2013) ("An adverse employment decision substantially corrupted by racial, gender, or other improper discrimination may be indicative of a recurrent policy or practice. A company's practice of *sex stereotyping* or a supervisor's refusal to promote 'another woman' may not be determinative for a particular job applicant, but it may be determinative for a

future applicant if left unsanctioned and allowed to persist as a lawful employment practice. We do not believe the Legislature intended to legitimize such practices, and the FEHA does not envision that individuals and the general public must tolerate discriminatory treatment in employment decisionmaking until it finally costs someone a job or promotion").

**53.** Complaint, ¶¶ 76, 82–91.

**54.** *Id.*, ¶ 79.

grooming standards for women required that they wear makeup. *Id.* at 1107. Although plaintiff argued that she was uncomfortable wearing makeup, the court held that the requirement did not constitute impermissible sex stereotyping, because there was no evidence that the policy was adopted to make women bartenders conform to a stereotypical view of what women wear, and the policy did not objectively prevent women from succeeding as bartenders. *Id.* at 1112 ("If we were to [accept plaintiff's argument], we would come perilously close to holding that every grooming, apparel, or appearance requirement that an individual finds personally offensive, or in conflict with his or her own self-image, can create a triable issue of sex discrimination"); see *id.* ("Jespersen ... was asked only to wear a unisex uniform that covered her entire body and was designed for men and women. The 'Personal Best' policy does not, on its face, indicate any discriminatory or sexually stereotypical intent on the part of Harrah's"). See also *Matthews v. Inter–Con Sec. Systems, Inc.*, No. B206764, 2009 WL 117406, *3 (Cal.App. Jan. 20, 2009) (Unpub.Disp.) ("Matthews has alleged in his pleadings nothing more than a personal desire not to be required to cut his hair. Like Ms. Jespersen, he has the right to choose the image he presents of himself, but like her, to plead and prove a violation of law he must allege more than he did in the trial court.... [H]e [did not] assert any disproportionate impact of Inter–Con's grooming policy based on gender other than the fact that he would be required to get haircuts, while women were not. He did not assert that his choice to have long hair was a political statement or a religious

requirement, or anything other than a personal preference. Nor did he assert in his pleadings that the policy would cause an adverse economic affect on men. Thus, the trial court did not err in sustaining the demurrers").[55]

Gonzales alleges that she was denied the opportunity to lactate during breaks—an opportunity afforded women who had given birth to their own child—because of a stereotyped view of her as a gestational surrogate. There is a great deal of literature about the stereotyping of gestational surrogates. See, e.g., Hierarchies of Discrimination in Baby Making?: A Response to Professor Carroll, 88 IND. L.J. 1217, 1221 (2013) (decrying "unthinking stereotypes and prejudices that endow genes with greater significance than other biological connections and envision a gestational surrogate as a mere 'carrier' and not the real mother"); The State of Surrogacy Laws: Determining Legal Parentage for Gay Fathers, 18 DUKE J. GENDER L. & POL'Y 353, 381–82 (Spring 2011) ("While not discounting the bond that forms between a woman and the child in utero, using a gestational approach relies on reproductive biology and reinforces societal stereotypes of women as the only parent who can effectively nurture a child"); My Two Dads: Challenging Gender Stereotypes in Applying California's Recent Supreme Court Cases to Gay Couples, 41 FAM. L.Q. 623, 635–36 (Fall 2007) (arguing that "[t]hose who advocate for a gestation-based rule for determining maternity emphasize the bond that forms between the surrogate and child while the child is in utero. Such an approach relies on and reinforces stereotypes of women as nurtur-

---

**55.** "Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05–313 VRW, 2005 WL 2893865, *3 (N.D.Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

ers and caretakers. In contrast, an intent-based approach recognizes that both sexes are capable of providing a child with love and nurtur[e]"); Are You My Mother? Defending the Rights of Intended Parents in Gestational Surrogacy Arrangements in Pennsylvania, 4 AM. U.J. GENDER SOC. POL'Y & L. 131, 153–56 (2006) (arguing that "[s]ince there is no evidence that a child benefits more from his relationship with a non-genetically-related surrogate than with his own genetic parents," any attempt by a state to argue that it has an important interest in furthering the bond between gestator and child or that gestation would be based on "sex-based stereotypes," and likely fail heightened scrutiny for equal protection purposes); see also *Johnson v. Calvert*, 5 Cal.4th 84, 107–08, 19 Cal.Rptr.2d 494, 851 P.2d 776 (1993) (noting various stereotypes surrounding gestational surrogacy in determining that husband and wife were the "natural parents" of a child born after the woman's egg was implanted in a surrogate).

While the matter is not free from doubt, the court declines, at this stage of the proceedings, to dismiss the sex stereotyping claims on the basis that being a gestational surrogate is not a form of sex-based stereotype. It is true that such a stereotype draws a distinction between two categories of women rather than between men and women. It is also true that it does not appear directly to concern the manner in which an employee does her work, as was the case in *Price Waterhouse*, 490 U.S. at 251, 109 S.Ct. 1775. See also *Back v. Hastings on Hudson Union Free School Dist.*, 365 F.3d 107, 115–16 (2d Cir.2004) (plaintiff denied tenure based on the stereotype that she could not be a "good mother" while performing a job that required long hours); *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 44 (1st Cir.2009) ("the assumption that a woman will perform her job less well due to her presumed family obligations is a form of sex-stereotyping

and that adverse job actions on that basis constitute sex discrimination").

A direct connection between job performance and sex stereotype has not always been required, however. See, e.g., *Doe ex rel. Doe v. City of Belleville*, 119 F.3d 563, 581–82 (7th Cir.1997) ("[A] man who is harassed because his voice is soft, his physique is slight, his hair is long, or because in some other respect he exhibits his masculinity in a way that does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex.... Just as in *Price Waterhouse*, then, gender stereotyping establishes the link to the plaintiff's sex that Title VII requires.... The question in both cases is whether a particular action (in *Price Waterhouse*, the exclusion from partnership, here, the harassment by coworkers) can be attributed to sex; reliance upon stereotypical notions about how men and women should appear and behave (in *Price Waterhouse*, by the partners, here, by H. Doe's tormentors) reasonably suggests that the answer to that question is yes"), vacated, 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998) (remanding in light of *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)); see also *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 874 (9th Cir.2001) ("At its essence, the systematic abuse directed at Sanchez reflected a belief that Sanchez did not act as a man should act. Sanchez was attacked for walking and carrying his tray 'like a woman,'... derided for not having sexual intercourse with a waitress [,] ... [a]nd, the most vulgar name-calling directed at Sanchez was cast in female terms. We conclude that this verbal abuse was closely linked to gender"). Here, a reasonable jury could conclude that Gonzales was subjected to the treatment she was because Marriott perceived she did not conform to

stereotypical views of how women act as it relates to motherhood or child bearing.

In sum, although the universe of cases endorsing impermissible sex stereotyping as basis for liability under Title VII does not necessarily include a case whose facts mirror those present here, the facts pled in the complaint, accepted as true, are sufficient to show that Gonzales was treated differently and less well than other lactating employees and that what a jury could find to be a sex stereotype animated that treatment. Consequently, the court denies Marriott's motion to dismiss Gonzales's sex stereotyping claims under Title VII and FEHA on the basis that she suffered discrimination because "she [did] not adhere to the traditional stereotype of motherhood, including attachment to an infant child 'at home.'" [56] This ruling is without prejudice to Marriott's ability to raise the issue at a later stage of the proceedings on a more developed record.

### 2. Whether Gonzales Has Adequately Alleged an Adverse Employment Action

Gonzales alleges that she was subjected to adverse employment action in the form of lost paid breaks, inconvenience and changes in her work schedule, workplace ostracization (exclusion from lunches and social events), and verbal abuse at the hands of her supervisors.[57]

Adverse employment action "must materially affect the terms, conditions, or privileges of employment to be actionable." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1052, 32 Cal.Rptr.3d 436, 116 P.3d 1123 (2005); see also *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir.2008) (an adverse employment action under Title VII is one that "materially affects the compensation, terms, conditions, or privileges of employment"); *Blount v. Morgan Stan-*

*ley Smith Barney LLC*, 982 F.Supp.2d 1077, 1082 (N.D.Cal.2013) (in a Title VII case, "an adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of ... employment' ").

California courts interpret adverse employment action for purposes of FEHA broadly, and hold that it includes more than "so-called 'ultimate employment actions' such as termination or demotion.... Although a mere offensive utterance or even a pattern of social slights by either the employer or co-employees cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment for purposes of section 12940(a) (or give rise to a claim under section 12940(h)), the phrase 'terms, conditions, or privileges' of employment must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." *Yanowitz*, 36 Cal.4th at 1054, 32 Cal.Rptr.3d 436, 116 P.3d 1123.

The Ninth Circuit interprets Title VII in the same manner. *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir.2004) ("We define 'adverse employment action' broadly," citing *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000); *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir.2000) (collecting cases)).

There are, however, limits to what can be considered adverse employment action. "A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient," and "the mere fact that an employee is displeased

---

**56.** Complaint, ¶ 76.

**57.** *Id.*, ¶¶ 38–43.

by an employer's act ... does not elevate that act" to the level of adverse action. *Akers v. County of San Diego*, 95 Cal. App.4th 1441, 1454–55, 116 Cal.Rptr.2d 602 (2002). See also *Jonassen v. Port of Seattle*, 550 Fed.Appx. 384, 386 (9th Cir.2013) (Unpub.Disp.) ("the verbal taunting to which Jonassen alleges he was subjected constitutes no more than 'simple teasing,' and thus does not rise to the level of an adverse employment action"); *Jaroslawsky v. City & Cnty. of San Francisco*, No. C 12–04949 JSW, 2013 WL 1287431, *2 (N.D.Cal. Mar. 28, 2013) ("ordinary tribulations of the workplace, or trivial harms, do not constitute adverse employment actions"); *Sutton v. Derosia*, No. 1:11–CV–01426–LJO, 2012 WL 4863788, *17 (E.D.Cal. Oct. 12, 2012) (finding no adverse action where supervisor refused to speak to employee, employee was transferred to a new supervisor, employee was excluded from an administrative staff meeting regarding her behavior, and employee's internet was disabled); *McRae v. Dept. of Corrections & Rehab.*, 142 Cal. App.4th 377, 386, 48 Cal.Rptr.3d 313 (2006) ("If every minor change in working conditions or trivial action were materially adverse actions then any action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit" (internal citations omitted)). Whether allegedly "adverse treatment properly should be considered discrimination in the terms, conditions, or privileges of employment is not, by its nature, susceptible to a mathematically precise test, and the significance of particular types of adverse actions must be evaluated by taking into account the legitimate interests of both the employer and the employee." *Yanowitz*, 36 Cal.4th at 1054–55, 32 Cal. Rptr.3d 436, 116 P.3d 1123.

■ Gonzales's allegations regarding the inconvenience she experienced in changing her work schedule and missing lunches and social events are not sufficient to plead adverse employment action as a matter of law. See *Brooks*, 229 F.3d at 929 ("[O]stracism suffered at the hands of coworkers cannot constitute an adverse employment action," citing *Strother v. Southern California Permanente Medical Group*, 79 F.3d 859, 869 (9th Cir.1996) ("[M]ere ostracism in the workplace is not enough to show an adverse employment decision")). Compare *Strother*, 79 F.3d at 864 n. 2 (employee was "held to a higher standard of job performance than male doctors; she was required to work under different and more stressful conditions; she was denied secretarial support and other services granted to other physicians; she was assigned unusually burdensome work schedules; she was denied reimbursement of certain expenses; she was subjected to surveillance, monitoring of her telephone calls, and searches through her personal belongings and documents; she received rude and abusive phone calls; she was subjected to insulting treatment and public ridicule; ... one male doctor once struck her with a clipboard, and ... another forced her out of his office with his door").

The few negative encounters Gonzales had with Masamori likewise do not show that she was subjected to an adverse employment action. *Sims v. City & County of San Francisco*, No. 14–CV–00576–SI, 2015 WL 1351143, *6 (N.D.Cal. Mar. 25, 2015)("a 'single, isolated discriminatory comment' [even] by [a] plaintiff's immediate supervisor [is] insufficient to trigger burden shift[ing] or to avoid summary judgment for defendant," quoting *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314–16 (6th Cir.1989)); see also *Patterson v. Apple Computer, Inc.*, 256 Fed.Appx. 165, 168 (9th Cir.2007) (Unpub.Disp.) ("Stray comments are insufficient to establish discrimination").

■ Nonetheless, the fact that, after a certain point, Gonzales was not permitted to take paid breaks like other lactating employees adequately alleges adverse employment action. Cf. *Howard v. Washington*, 254 Fed.Appx. 576, 578 (9th Cir.2007) (Unpub.Disp.) ("Actions that materially affect compensation are adverse employment actions," citing *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2002)); *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) ("We have recognized that an adverse employment action exists where an employer's action negatively affects its employee's compensation").

Further, if Gonzales is able to prove that she was entitled to reasonable accommodation in the form of lactation breaks, paid or unpaid, the denial of such breaks could constitute adverse employment action, as it would materially change the conditions and privileges of her employment. See *Phan v. CSK Auto, Inc.*, No. 11–CV–02327 YGR, 2012 WL 3727305, *8 (N.D.Cal. Aug. 27, 2012) ("Being refused mandatory breaks constitutes an adverse employment action under FEHA"). Because Gonzales's claim that she was entitled to reasonable accommodation survives challenge, her claims that such actions constitute adverse employment action survive as well.

**3. Whether Gonzales States a Claim that Sex Stereotyping Informed the Alleged Adverse Employment Action**

■ To state a sex stereotyping claim, Gonzales must also plead and prove "evidence of stereotypical motivation on the part of the employer." *Jespersen*, 444 F.3d at 1113. This can be shown through statements made by the employer that directly concern the employee's gender or by the timing of the adverse employment action if it occurred shortly after plaintiff began exhibiting non-stereotypical behavior. *Id.*; *Nichols*, 256 F.3d at 874.

■ Gonzales alleges the following facts that she contends give rise to an inference Marriott's adverse employment action was motivated by impermissible sex stereotyping: (1) the fact that Marriott told her she was no longer allowed to take breaks to express milk after she stopped sending milk to her biological child,[58] (2) Masamori's statement that she did not qualify for accommodation because she was not pumping for the purpose of feeding a child at home,[59] and (3) Masamori's angry and dismissive behavior.[60]

The fact that Marriott told Gonzales she could no longer take breaks to express milk thirty days after she stopped sending milk to her biological child could be interpreted in multiple ways. On one hand, the fact that Marriott allowed Gonzales to take breaks at all, despite the fact that she was a gestational surrogate, implies that its decision was not motivated by a negative view of gestational surrogacy. On the other hand, the fact that Marriott required Gonzales to stop taking lactation breaks so soon after she stopped sending milk to the child to whom she had given birth may indicate that the use to which Gonzales wished to put the expressed milk was of significance in Marriot's decisionmaking process.

The other facts Gonzales cites are similarly susceptible of multiple interpretations. Gonzales alleges that Masamori's words and actions suggest he took personal issue with Gonzales's decision to donate

58. *Id.*, ¶ 27.

59. *Id.*, ¶ 34.

60. *Id.*, ¶ 31 ("If you had rights, we'd be talking to your lawyer"); *id.*, ¶ 35 ("When Ms. Gonzales offered to bring in a doctor's note explaining her situation, Mr. Masamori told her, 'don't bother'").

her milk because she was not caring for the child to which she had given birth. As Marriott argues, however, Masamori could also have been motivated not by sex stereotypes but by a belief that legally Marriott no longer needed to accommodate Gonzales by providing paid breaks.

Because conflicting inferences can be drawn from Gonzales's allegations, it would be inappropriate in the context of a Rule 12(b)(6) motion to decide the issue as a matter of law. The court therefore denies Marriott's motion to dismiss Gonzales's third and fourth causes of action.

### III. CONCLUSION

For the reasons stated, the court denies Marriott's motion to dismiss.